**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| W.J.W., by and through his parent and Educational Decision maker, Christine Dudley, | : | |
| | : | |
| | : | |
| | : | Civil Action No. |
| Plaintiff/Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| LOWER MERION SCHOOL DISTRICT | : | |
| | : | |
| Defendant/Appellee. | : | |

---

## COMPLAINT

### I.   PRELIMINARY STATEMENT.

1.   This action is filed by Christine Dudley, the parent and educational decision maker of W.J.W. and W.J.W. in the nature of a Complaint and Appeal from the decision and order of a Special Education Hearing Officer Anne Carroll ("HO Carroll"), and herein, the "Hearing Officer Decision" (Exhibit A to this Complaint). HO Carroll ruled in favor of the Plaintiffs in part but found for the Lower Merion School District ("LMSD") in part. The Plaintiffs assert that HO Carroll erred by approving: 1) IEPs which lacked measureable postsecondary transition goals and meaningful transition services resulting in only trivial progress for W.J.W; 2) the LMSD's actions in relying upon W.J.W. to make educational decisions rather than his parent; 3) the LMSD's repeated use of the criminal justice system to handle behavioral issues at school; 4) denying W.J.W. an Independent Educational Evaluation ("IEE") and 5) finding that W.J.W. was educated in the least restrictive environment.

## II. JURISDICTION AND VENUE.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 20 U.S.C. §1415(i).

3. The Parent and Student's remedies are authorized by the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq.

4. Venue is appropriate in this District pursuant to 28 U.S.C. §1391. Both parties reside within this District and the acts and events at issue in this action occurred in this District.

## III. PARTIES.

5. The LMSD is a local educational agency with offices located at 301 East Montgomery Ave., Ardmore, PA 19003. The LMSD is organized pursuant to the Public School Code of 1949, the Act of March 10 and as amended 24 P.S. 1-101 *et seq* and is the recipient of several sources of federal and state education funds. The LMSD is an educational agency designated by Pennsylvania Law and the Pennsylvania Department of Education for the provision of educational services to individuals, including W.J.W. residing within its location.

6. W.J.W. is now a eighteen year old child who the LMSD determined during his first grade year to be eligible for special education services under the IDEA with a Specific Learning Disability and at various time as having an Emotional Disturbance. He is identified as having needs in the areas of reading, written language and math, and emotional needs. W.J.W. has resided within the boundaries of the LMSD at all times relevant to this Complaint, other than periods of time when he was placed in juvenile detention facilities.

2

7. Christine Dudley is W.J.W.'s mother and she has resided within the boundaries of LMSD at all times relevant to this Complaint and pursuant to Pennsylvania law remains his educational decision maker under the IDEA.

## IV. ADMINISTRATIVE EXHAUSTION/PROCEDURAL HISTORY OF THE CASE.

8. Plaintiffs have exhausted their administrative remedies and invoke the judicial review provisions of the IDEA, 20 U.S.C. §1415 in connection with the HO's Decision, Ex. A. in this matter.

9. On July 1, 2009, W.J.W., by and through his parent, Christine Dudley, (herein "Parent") filed a Due Process Complaint against the LMSD pursuant to the IDEA, 20 U.S.C. 1400, alleging that the LMSD had violated the IDEA and denied W.J.W. a Free Appropriate Public Education ("FAPE").

10. A Due Process Hearing was held over a period of some ten days, and some 14 witnesses testified. There is a transcript of this hearing of some 2228 pages. Both parties entered multiple exhibits.

11. HO Carroll entered her order on March 11, 2010, Ex. A. herein, "HO Decision."

## V. ESSENTIAL FACTS ABOUT W.J.W.

12. W.J.W. is one of two sons of Christine Dudley, a longtime resident of the LMSD.

13. The family is African-American and resides in Ardmore, Pennsylvania within the LMSD.

14. Christine Dudley attended LMSD where she was placed in special education classes.

15. W.J.W.'s brother, R.M., was identified as a special education student but is being re-evaluated.

3

16. W.J.W. has average intelligence but despite this average intelligence he did not make adequate academic progress at Lower Merion High School.

17. Christine Dudley, and W.J.W. are plaintiffs in the lawsuit, *Blunt v. Lower Merion School District*, Civil Action No. 07-3100 which is pending in this Court.

**ELEMENTARY AND MIDDLE SCHOOL YEARS**.

18. W.J.W. attended Penn Valley Elementary School.

19. Despite requests, the family has not been able to obtain the complete educational records for W.J.W. for his educational services from grade three to grade eight.

20. W.J.W. was identified as a student with a Specific Learning Disability apparently when he was in first grade after the LMSD completed an Initial Evaluation. The actual initial evaluation has never been located. It is unknown if he was observed in the classroom as required by law.

21. When W.J.W. was in second grade he was tested for both reading and math. An informal reading evaluation indicated he was functioning at the preprimer instructional level. W.J.W.'s total math score was K.9 (ninth month of kindergarten). LMSD asserted that W.J.W. needed "constant adult support in tasks involving reading and writing and maximum support when learning new concepts in math." It was again asserted that he had average intelligence.

22. As a third grader, W.J.W.'s math skills were at a primer level and it was also determined that he was still reading below grade level. The LMSD decided that W.J.W. would not participate in the regular education curriculum. He was placed in a learning support class.

23. As a second and third grader, teachers noted in his IEP that he was 'motivated to learn."

4

24. W.J.W. attended Welsh Valley Middle School. Records from Welsh Valley are also somewhat limited.

25. When W.J.W. was in eighth grade, his reading level was grade 3.2 (third grade, second month).

26. There were numerous disciplinary reports about W.J.W. when he was in attendance at Welsh Valley.

**HIGH SCHOOL YEARS.**

27. W.J.W. began to attend Lower Merion High School in ninth grade, 2006-2007.

28. As a ninth grader, it was reported that W.J.W. was reading on a second to third grade level. The IEP team was concerned and scheduled him for special reading support eight times in an eight day cycle and instructional support lab four times in an eight day cycle.

29. Later, W.J.W. began the Wilson Reading Program "one time daily" about half-way through his ninth grade year. He was scheduled for Learning Support English and History classes but switched to standard level classes.

30. In December 2006, when W.J.W. was in ninth grade, another student on the school bus started a fight with W.J.W. LMSD suspended W.J.W. and called the Lower Merion Police Department who arrested W.J.W. the same day. No manifestation review was conducted and the parent did not know to request same.

31. W.J.W. was sent by the Juvenile Court to the Glen Mills School, a juvenile detention center, for nine months.

32. W.J.W. did not appear to make academic progress during his time at the Glen Mills School. It does not appear that an IEP was in place during his stay there.

5

33. When W.J.W. returned from the Glen Mills School to complete his sophomore year at LMSD, a meeting was held and the LMSD agreed to provide W.J.W. with emotional support by having a teacher meet with him every morning during homeroom.

34. W.J.W. returned to LMSD in the spring of 2008.

35. The LMSD proposed that W.J.W. attend a private school but Christine Dudley misunderstood this proposal as a return to a program like Glen Mills, as staff did not sufficiently explain this to her. No specific school was identified or proposed so that Ms. Dudley could go and visit same.

36. In December, 2008, W.J.W. was reevaluated which consisted largely of record reviews as W.J.W. resisted testing and minimal efforts were made to gain his involvement in same.

37. During the 2008/2009 school year, as an eleventh grader and half-way through the year, W.J.W. was evaluated for the first time for transition planning. The assessment determined that his abilities and interests were most suited to a physical fitness instructor or landscape gardener. W.J.W.'s schedule was changed and he spent the second half of eleventh grade taking classes in the morning and volunteering at Lankanau Hospital as a messenger in the afternoons. No further job training or transition plans were discussed.

38. In April of 2009, W.J.W. was placed in an alternative placement due to a disciplinary action. He was there for two months. Despite numerous requests, no IEP meeting was ever scheduled to discuss the new placement or IEPs.

6

39. In all juvenile court proceedings during this time, W.J.W. was represented through the public defender system as the family could not afford private counsel. W.J.W. successfully completed probation. His P.O. was not aware of and had not seen his IEP.

40. Throughout the time that W.J.W. was educated within the LMSD, the LMSD never explained the intent and purpose of "transition services" to Christine Dudley.

41. Throughout the time that W.J.W. was educated within the LMSD, the LMSD staff continuously deferred to what W.J.W. wanted to do or not do, including declining services rather than obtaining parental consent or approval for same.

42. At all times herein relevant, the LMSD has declined, and refused to provide to Counsel for W.J.W., the testing protocols for testing of W.J.W.

43. W.J.W. testified that he learned to read while he was incarcerated within an alternative program where he was sent by the juvenile justice system.

44. W.J.W. testified that he did not believe he had a learning disability or any disability or any difficulty in academic skills.

45. Mr. Umar Abdullah-Johnson, a private African American nationally certified school psychologist evaluated W.J.W. during the 2009/2010 school year and concluded that he had been denied an appropriate program of education by the LMSD. He concluded that W.J.W.'s academic skills were still at the elementary school level, that he needed emotional counseling and that he was not ready to graduate from high school at the conclusion of the 2009/2010 school year.

## VI. HEARING OFFICER CARROLL'S DECISION, MARCH 11, 2010.

46. HO Carroll concluded there were five issues for hearing, HO Decision, pg. 2-3,

a. Did the LMSD fail to provide W.J.W. with an appropriate program and placement for some portion of the 2007/2008, 2008/2009 or 2009/2010 school years?

b. Is W.J.W. entitled to compensatory education?

c. Is the LMSD required to provide W.J.W. with an independent educational evaluation ("IEE")?

d. Is the LMSD required to provide W.J.W. with intensive reading and math instruction during the remainder of the 2009/2010 school year?

e. Is the LMSD required to provide W.J.W. with an additional year of secondary education and required to identify and fund a private placement for the 2010/2011 school year?

47. HO Carroll determined that Christine Dudley was not prevented from meaningful participation in W.J.W.'s IEP meetings because she frequently did not understand the discussions, and was unable to read and understand the documents she was provided and/or asked to sign. HO Decision, pg. 12-16.

48. HO Carroll determined that the LMSD was not responsible for the placement of W.J.W. into juvenile detention placements and was not responsible for his educational services in those placements. HO Decision, pg. 16-17.

49. HO Carroll held that the parent could raise issues based upon inappropriate transition services, inappropriate discipline/number of disciplinary referrals and denial of Extended School Year ("ESY") services. HO Decision, pg. 17-18.

50. HO Carroll held that the Parent's request for a private school placement for the current school year (2009/2010) was no longer a feasible remedy due to the passage of time but

that it would be an unreasonable exaltation of form over substance to deny W.J.W. a real remedy in the form of compensatory education. HO Decision, pg. 18.

51. HO Carroll concluded that the LMSD was not responsible to pay for an Independent Educational Evaluation of W.J.W., which by the time the hearing had concluded, had been completed by Mr. Umar Abdullah-Johnson, a nationally certified school psychologist. HO Decision, pg. 19-22.

52. HO Carroll held that in most respects, the District "met the legal standards for offering FAPE in this case by providing detailed IEPs with annual goals designed to meet W.J.W.'s needs arising from both his learning disabilities and emotional disturbance." HO Decision, pg. 22-23.

53. HO Carroll concluded that the District "fell short of properly implementing the IEPs it offered in three respects."

   a. HO Carroll found the District eliminated additional reading instruction beginning in February 2009. HO Decision, pg. 23-24. The HO therefore, ordered the District to provide W.J.W. with "daily intensive reading instruction equal to the length of an academic literacy class for the remainder of the current school year and provide compensatory education for insufficient reading instruction from January 29, 2009 to the date that W.J.W. left the LMSD for the ACT program in April 2009 and from the first day of school in the current (2009/2010) school year through the date intensive reading instruction begins."

   b. HO Carroll concluded that District failed to provide W.J.W. sufficient math instruction because although it was offered, the District allowed W.J.W. to

9

decline the services. HO Decision, pg. 24. Therefore, the HO Carroll concluded that the District must set aside a period each day for W.J.W. to work with the math specialist and provide W.J.W. with compensatory education in the form of math instruction equal to the length of a regular class period from the beginning of the 2008/20009 school year through the date W.J.W. left the LMSD in April 2009 until the date the additional period of math instruction begins.

c. HO Carroll found that the LMSD failed to provide W.J.W. with emotional support services. HO Decision, pg. 24-25. She concluded that the LMSD had allowed W.J.W. to reject the services and ordered the LMSD to reinstate the services and provide W.J.W. with a 30 minute period of emotional support services each week and compensatory education in the form of 30 minutes of emotional support or counseling services each week from November 1, 2009 the approximate time W.J.W. began refusing services through the date W.J.W. left the LMSD in April 2009 and from the beginning of the current school year until services begin.

54. HO Carroll wholly absolved the LMSD of any failure to provide W.J.W. an adequate transition plan citing to *High v. Exeter Twp. School District*, 2010 WL 363832 (E.D. Pa. Feb. 1, 2010). HO Decision, pg. 25. HO Carroll ignored the LMSD's failure to begin transition services when W.J.W. was age 14 and to continue those services and to provide transition services based upon objective measures of W.J.W.'s academic and functional skills, designed utilizing measurable goals and including actual direct transition services. The only indication of transition services in W.J.W.'s IEPs included

a brief period of time during which W.J.W. was placed at a local hospital in a volunteer position late in his school career.

55. HO Carroll concluded that W.J.W. lacked sufficient academic credits to graduate at the conclusion of his twelfth grade year, 2009/2010. HO Decision, pg. 25-27. She found that W.J.W. was "clearly still lacking in basic reading, writing and math skills, as well as sufficient credits to meet District graduation requirements."

56. HO Carroll found that "there is no basis, therefore, for ordering a private school as a remedy for past denial of FAPE" but, HO Carroll held that the question of an appropriate program and placement going forward is "more problematic." HO Carroll concluded that "Student's inability to fully benefit from the educational services provided to him appears to be part of his ED disability." HO Decision, pg. 27. She then concluded that "the IEP team will be ordered to consider alternative settings and methods, such as another public high school, tutoring services or a private placement." The additional services must also include a transition plan, which may be the same or similar to the transition services the District has been providing." HO Decision, pg. 28.

57. HO Carroll issued an "Action Items/Order" with her decision, Ex. A,  requiring the LMSD to take the following actions:

    1.  Provide W.J.W. with "direct, intensive reading instruction at a specific time each school day for a period of time equal to the length of an academic literacy class period."
    2.  Provide W.J.W. with direct, intensive basic math instruction at a specific time each school day for a period of time equal to the length of a regular class period.
    3.  Provide W.J.W. with 30 minutes of emotional support services each week at a specific time.
    4.  Assure that W.J.W. arrives at the location where each designated period of reading instruction, math instruction and emotional support services are to be

delivered and remains in the room for the entire period, escorting him to the room if necessary.

5.   Provide W.J.W. with compensatory education as follows:

    a.   direct, intensive reading instruction measured by the length of an academic literacy period for each day W.J.W. attended school from January 29, 2009 through April 2, 2009 and during the 2009/2010 school year until the reading instruction ordered in P. 1, above begins;

    b.   direct, intensive basic math instruction, measured by the length of a regular class period, for each day W.J.W. attended school from the first day of the 2008/2009 school year through April 2, 2009, and from the first day of the 2009/2010 school year until the math instruction ordered in P. 2, above begins;

    c.   emotional or support counseling services equal to 30 minutes for each full (5 day) week school was in session from November 1, 2008 through April 2, 2009 and from the first full (5 day) week school was in session during the 2009/2010 school year until the emotional support services ordered in P. 3, above begin.

    d.   Provided W.J.W. with educational services for a minimum of one additional school year, including direct, intensive reading instruction, direct, intensive math instruction, instruction in writing, emotional support or counseling services, additional academic instruction, transition services, and additional related services all "as determined by W.J.W.'s IEP team." HO Decision, pg. 2, Action Items/Order.

    e.   Convene the IEP team with the assistance of an IEP facilitator from the Office for Dispute Resolution.

    f.   The IEP team shall not be limited to considering services within the District and "W.J.W. shall not be required to return to Lower Merion High School for the 2010/2011 school year as a student in regular academic classes unless he agrees."

    g.   The IEP team can increase the services ordered in P. 1-3 and 6 but cannot decrease same unless the Parent so requests.

## VII. FAILURE TO COMPLY WITH HO'S DECSION - ADDITIONAL FACTS

58. Since March 11, 2010, the parties have met in an IEP format on at least two occasions. An ODR facilitator has been in attendance.

59. LMSD has yet to offer a complete, revised IEP for W.J.W., including an IEP addressing services for summer 2010 or proposing a program/placement for 2010-2011 school year. LMSD did change W.J.W.'s schedule to permit the additional direct reading

instruction, direct math instruction and emotional counseling. However, LMSD has not consistently assured the emotional counseling, continuing to allow W.J.W. to refuse to attend same.

60. During a recent IEP meeting, when the question of Extended School Year was raised, the staff informed the parent that the LMSD computer "automatically" checks "no" by ESY unless that is overridden by the staff. ESY has not been arranged for 2010.

61. Throughout this time frame, the LMSD, particularly, the special education teacher, has continued to defer to W.J.W. as the educational decision maker, instead of W.J.W.'s mother, Christine Dudley.

62. At this time, W.J.W. is not scheduled to graduate from LMSD this June, 2010. Despite specific requests of the LMSD staff to assist Christine Dudley to ensure that an appropriate program is found for W.J.W. for summer and 2010/2011, LMSD has not taken such steps to assist her. No Notice of Recommended Placement or proposed IEP has been issued to date for W.J.W. that is consistent with the HO's Decision.

**COUNT I: ISSUES ON APPEAL UNDER IDEA, 20 U.S.C. 1400, et. seq..**

I.   *Parental Participation.*

63. The IDEA requires parental participation in the IEP team process. 20 U.S.C. §1401, §1414.

64. Christine Dudley was not a full participant in the IEP team process because the LMSD staff deliberately and frequently excluded her from decision-making, instead relying upon W.J.W. to make decisions about his education. This is contrary to the IDEA and to Pennsylvania law which requires the LMSD to honor Christine Dudley as the decision maker until W.J.W. either graduates or ages out at age 21.

65. The HO Carroll committed fundamental error by excusing LMSD's staff's intentional refusal to honor Christine Dudley as the decision maker.

## II. Inadequate Transition Program.

66. The IDEA and Pennsylvania law require LMSD to ensure that W.J.W. receives transition assessment and transition services from age 14 forward.

67. W.J.W. was not provided an adequate transition program at age 14 or grade 9 and moving forward as required by the IDEA and Pennsylvania law. At best, he had a haphazard program for part of one school year, wherein he was a volunteer at a local hospital requiring him to miss critical direct instruction time in reading, writing and math.

68. The HO Carroll committed fundamental error by finding that LMSD provided W.J.W. an adequate transition program and apparently believes that there can never be an inadequate transition program according to her decision.

## III. Least Restrictive Environment.

69. The IDEA requires that W.J.W. be provided his education in the least restrictive environment.

70. W.J.W. was wrongfully placed into racially segregated special education classrooms for much of his time at the LMSD.

71. The HO Carroll failed to even address this issue in her decision or inadvertently approved it.

## IV. Failure to Maintain Records and Request for Independent Educational Evaluation.

72. The IDEA and Pennsylvania law require the LMSD to maintain and preserve W.J.W's educational records, including testing protocols.

14

73. The LMSD refused W.J.W. an IEE but never requested a hearing on same.

74. Nonetheless, and despite objection from the parent during hearing, the HO Carroll upheld the evaluations of the LMSD and did so despite the testimony of staff that the school district did not have the testing protocols and/or had destroyed them intentionally.

75. The HO committed fundamental error in failing to order payment for the Independent Educational Evaluation of Mr. Umar Abdullah-Johnson.

V.  *Years of Education and/or Compensatory Education.*

76. The IDEA provides that students may receive educational services pursuant to their IEPs and unique educational needs until age 21 or until they formally graduate from high school.

77. The LMSD never informed Christine Dudley that W.J.W. could receive services until age 21 or about transition services in any meaningful way.

78. The LMSD proposed at one point that W.J.W. would graduate at the close of the 2009/2010 school year, but later there was testimony that he would not be able to for lack of sufficient credits.

79. HO Carroll ordered that W.J.W. was entitled to only or "at least" one more year of education.

80. The HO committed fundamental error by failing to recognize that W.J.W. is legally entitled to an education through age 21 pursuant to the IDEA.

81. The Third Circuit has held that a free appropriate public education must be more than one which is "trivial" or of "de minimus" benefit. *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F. 2d 171 (3d Cir. 1988), cert denied 488 U.S. 1030 (1989).

15

The evidence in this case fully establishes that W.J.W., a student with average intelligence, has had a wasted educational career, given that in his senior year of high school at LMSD, his academic skills were still at the elementary school level, and he lacked the ability to move on to postsecondary education or training.

**WHEREFORE**, Christine Dudley on behalf of W.J.W., respectfully requests that the Court:

1.  Assume jurisdiction of this matter;

2.  Receive and consider the records of the administrative proceeding;

3.  Receive and consider additional evidence from the date of the decision to the filing of this appeal establishing the continuing lack of an appropriate IEP for W.J.W., including an ESY 2010 program.

4.  Reverse the HO decision with respect to:

    a.  The finding that Ms. Dudley enjoyed <u>parental participation</u> in the IEP process as required by the IDEA and state law.

    b.  The finding that there was an <u>adequate transition program.</u>

    c.  The finding that no <u>Independent Educational Evaluation</u> was necessary.

    d.  The lack of a specific finding concerning the <u>Least Restrictive Environment</u>.

    e.  The lack of a specific finding concerning IEPs with <u>measurable present levels of performance, and goals and objectives.</u>

    f.  The inaccurate finding that the IEPs contained Functional Behavior Assessments and Behavioral Intervention Plans for W.J.A. and otherwise complied with the IDEAs requirement for behavioral planning.

16

## COUNT II: REASONABLE ATTORNEYS' FEES PURSUANT TO THE IDEA.

82. The facts as set forth above are realleged and incorporated herein by reference.

83. Parents who succeed on any significant issue in any action or proceeding brought under the IDEA and/or the ADA and/or Section 504 are prevailing parties and thereby entitled to recover their reasonable attorneys' fees and costs. 20 U.S.C. 1415; 29 U.S.C. 794a(b).

84. As a result of the HO's decision, which found that the LMSD did not provide W.J.W. with sufficient reading, math and emotional support and which awarded compensatory education, and a specific program of education, plaintiffs are prevailing parties.

85. Through the date of the HO's Decision, plaintiffs attorneys at the Public Interest Law Center of Philadelphia have expended 264.50 hours on Plaintiffs behalf to the close of the hearing and incurred attorneys fees at varying rates to the March 11, 2010 decision date of a total of $70,880.00. The Public Interest Law Center of Philadelphia has also incurred expenses to date of: $8659.55. This includes general litigation expenses of $2954.55, assistant litigation costs for Becca Devine in the amount of $5,355 (63 hours at $85.00 an hour) for assistance in preparation for the hearing, at the hearing, and IEP meeting attendance) and the filing fee cost for this appeal and complaint of $350.00. In addition, Julia Schofield, a local attorney who assisted in the preliminary aspects of this case and including portions of the administrative hearing has incurred fees for 50.8 hours in an amount of $10,160.00.

86. The expenditure of attorneys fees, assistant fees, and litigation costs were necessary to secure an award in W.J.W.'s favor in the administrative proceedings below.

17

87. The fees are continuing to accrue despite efforts of counsel to resolve same by forwarding information about the fees to LMSD's counsel.

## COUNT III: FAILURE TO COMPLY WITH HO DECISION, SEC. 1983

88. The facts as set forth above are realleged and incorporated herein by reference.

89. The Third Circuit has specifically held that section 42 U.S.C.§ 1983 may be used to enforce an administrative process and decision. *Jeremy H. by Hunter v. Mount Lebanon School District*, 95 F. 3d 272, 279 (Third Circuit, 1996); *Medici v. Pocono Mountain*, 2010 WL 1006917 (M.D. Pa. March 16, 2010).

90. Since the March 11, 2010 HO Decision, the parent and W.J.W. have attended meetings with the LMSD. The IEP team changed W.J.W.'s schedule to include direct intensive reading and direct intensive math and emotional services. However, at last report, W.J.W. was not receiving the emotional services as the IEP case manager allowed W.J.W. to decline services without informing Christine Dudley.

91. Since the March 11, 2010 HO Decision, the IEP team agreed that W.J.W. will attend a private program during 2010-2011, and that he needs Extended School Year services and that these could be provided in conjunction with whatever private program was selected for W.J.W. for 2010-2011. Christine Dudley specifically asked for help in obtaining W.J.W.'s access into a private program. However, LMSD has not acted with dispatch in proposing a complete IEP including a program and placement for W.J.W. for summer 2010 and for the 2010-2011 school year. Although the IEP team has met, the LMSD has failed to offer any program in particular for W.J.W. whose parent and advocates have been forced to search out programs on their own.

92. The LMSD is in violation of the March 11, 2010 HO's Decision, is acting under color of law, intentionally, willfully and with deliberate indifference to deprive W.J.W. of his right to a new IEP, with program and placement as required in violation of the decision, the IDEA and Section 1983.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs request the following relief:

1. The Court should receive the records of the administrative proceedings, hear additional evidence at the request of a party and base its decision on a preponderance of the evidence.

2. The Court should grant such relief as the Court determines is appropriate and do the following:

    (a) Require the LMSD to conduct a complete search of the LMSD to determine the location of any and all educational records of W.J.W., including testing protocols, and to provide same to Plaintiffs;

    (b) Reverse the HO Carroll and find that the LMSD denied W.J.W. a free appropriate public education in all respects as noted within this complaint.

    (c) Award compensatory education for the entire period that W.J.W. has been denied a FAPE.

    (d) Award Plaintiffs their reasonable attorney fees, assistant fees and costs which plaintiffs have incurred and/or will incur in prosecuting this action, and which they have incurred in the administrative proceedings below; and

(e) Award such other relief as the Court deems appropriate.

Dated this 8th day of June, 2010.

/s/ Sonja D. Kerr
Sonja D. Kerr, Esq., PA Bar 95137
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway, 2nd Floor
Philadelphia, PA 19103
PH:            215-627-7100, Ext. 229
FAX:          215-627-3183
EMAIL:        skerr@pilcop.org

*Counsel for Student and his parent*

Pennsylvania
# Special Education Hearing Officer

**In re: Due Process Hearing for Walter Jonathan Whiteman, File No. 00011-0910LS**

## ACTION ITEMS/ORDER

In accordance with the accompanying decision, it is hereby **ORDERED** that the Lower Merion School District shall take the following actions:

1.  Provide         with direct, intensive reading instruction at a specific time each school day for a period of time equal to the length of an academic literacy class period.

2.  Provide         with direct, intensive basic math instruction at a specific time each school day for a period of time equal to the length of a regular class period.

3.  Provide         with 30 minutes of emotional support services each week at a specific time.

4.  Assure that      arrives at the location where each designated period of reading instruction, math instruction and emotional support services are to be delivered and remains in the room for the entire period, escorting him to the room if necessary.

5.  Provide        with compensatory education as follows:

    a.  direct, intensive reading instruction. measured by the length of an academic literacy period, for each day      attended school from January 29, 2009 through April 2, 2009 and during the 2009/2010 school year until the reading instruction ordered in ¶ 1, above begins;

    b.  direct, intensive basic math instruction, measured by the length of a regular class period, for each day      attended school from the first day of the 2008/2009 school year through April 2, 2009 and from the first day of the 2009/2010 school year until the math instruction ordered in ¶ 2, above begins;

    c.  emotional support or counseling services equal to 30 minutes for each full (5 day) week school was in session from November 1, 2008 through April 2, 2009 and from the first full (5 day) week school was in session during the 2009/2010 school year until the emotional support services ordered in ¶3, above begin.



EXHIBIT

_A_

6.  Provide _____ with educational services for a minimum of one additional school year including:

   a.  direct, intensive reading instruction for such amount of time and delivered in such manner as _____ IEP team determines;

   b.  direct, intensive math instruction for such amount of time and delivered in such manner as _____ IEP team determines

   c.  instruction in writing for such amount of time and delivered in such manner as _____ IEP team determines;

   d.  emotional support or counseling services for such amount of time and delivered in such manner as _____ IEP team determines;

   e.  such additional academic instruction as may be necessary for _____ to meet graduation requirements and/or IEP goals, for such amount of time and delivered in such manner as _____ IEP team determines;

   f.  transition services as determined by _____ IEP team;

   g.  such additional related services, if any, that _____ IEP team determines are necessary to assist Jon in benefiting from the instruction ordered herein.

7.  Convene _____ IEP team to determine an appropriate program and placement for the 2010/2011 as described in ¶6 above, with the assistance of an IEP facilitator from the Office for Dispute Resolution or a private provider of the District's choice.

8.  In considering how to provide instructional and related services in accordance with this order, the IEP team shall not be limited to choosing programs/services that are available within the District or that are available from private facilities/providers, provided, however, that _____ shall not be required to return to Lower Merion High School for the 2010/2011 school year as a student in regular academic classes unless he agrees.

9.  _____ IEP team may increase the services ordered in ¶¶1—3 and 6 but may not decrease the services unless Parent so requests.


Dated: March 11, 2010                                   *Anne L. Carroll*

                                                        Anne L. Carroll, Esq., Hearing Officer

Pennsylvania
# Special Education Hearing Officer

## DECISION

### ODR No. 00011-0910LS

Child's Name:

Date of Birth:  October 5, 1991

Dates of Hearing:  8/26/09; 9/29/09, 10/9/09, 10/12/09, 10/13/09, 10/14/09, 10/15/09, 1/4/10, 1/8/10, 1/15/10

### OPEN HEARING

| Parties to the Hearing: | Representative: |
|---|---|
| **Parent**<br>Christine Dudley<br>168 Simpson Road<br>Ardmore, PA 19003 | **Parent Attorneys**<br>Sonja Kerr, Esq.<br>Sandra Wang, Esq.<br>Public Interest Law Center of Philadelphia<br>1709 Benjamin Franklin Parkway, 2nd Floor<br>Philadelphia, PA 19103 |
| **School District**<br>Lower Merion<br>301 E. Montgomery Avenue<br>Ardmore, PA 19003-3338 | **School District Attorney**<br>Gail Weilhimer, Esq.<br>Wisler, Pearlstine, LLP<br>484 Norristown Road, Suite 100<br>Blue Bell, PA 19422 |

Date Record Closed:                February 24, 2010

Date of Decision:                  March 11, 2010

Hearing Officer:                    Anne L. Carroll, Esq.

## INTRODUCTION AND PROCEDURAL HISTORY

, known as Jon, is presently a 12th grade student at Lower Merion High School. Jon has been IDEA eligible by reason of learning disabilities since first grade.

Mother filed her due process complaint early in July 2009, seeking an IEE, intensive reading and math instruction, two years of compensatory education for lack of educational progress, including inadequate transition services, a private school placement for the 2009/2010 school year and an additional year of school in the private placement, contending that is unprepared for graduation and the completion of his secondary education program.

For the reasons that follow, the District will be required to provide Jon with intensive, individualized reading and math instruction for the remainder of the current school year. The District will also be ordered to offer the intensive reading and math instruction, along with other educational and related services in a setting other than Lower Merion High School for a minimum period of an additional school year.    will also awarded limited compensatory education for the 2008/2009 and 2009/2010 school years. In all other respects, Parent's claims will be denied.

## ISSUES

1.   Did the Lower Merion School District fail to provide               n with an appropriate program and placement at any time during the 2007/2008, 2008/2009 or 2009/2010 school years?

2.   Is                    entitled to compensatory education and if so, for what amount of time and in what form?

3.   Is the Lower Merion School District required to provide                with an independent educational evaluation (IEE)?

4.   Is the Lower Merion School District required to provide                with intensive reading and math instruction during the remainder of the 2009/2010 school year?

5.  Is the Lower Merion School District required to provide          with an additional year of secondary education, and if so, is the District required to identify and fund a private placement for the 2010/2011 school year?

# FINDINGS OF FACT

### Background Facts Relevant to the Issues in Dispute

1.  Walter Jonathan Whiteman (Student) is an 18 year old child, born October 5, 1991. He is a resident of the Lower Merion School District and is eligible for special education services. (N.T. pp. 866)

2.  Student has a current diagnosis of specific learning disability (SLD) and emotional disturbance (ED) in accordance with Federal and State Standards. 34 C.F.R. §300.8(a)(1), (c)(4)(i), (10); 22 Pa. Code §14.102 (2)(ii) (N.T. p. 435; S-2, p. 13, S-18, p. 9)

3.  Presently in 12th grade, Student has been educated in the Lower Merion School District since kindergarten and was identified as IDEA eligible in 1st grade. (N.T. p. 398; S-2)

4.  In December 2006, the middle of 9th grade (2006/2007 school year), Student was involved in an incident on the school bus that resulted in injury to another student. The District suspended Student for 4 days and notified the police, who arrested him. Student admitted to the charge of simple assault and was detained in the Montgomery County Youth Center at Eagleville, near Norristown, until January 2007, when he was placed on probation. (N.T. pp. 1683, 1684; P-15, p. 2, P-46, p. 3)

5.  In April 2007, Student was arrested in Delaware County and charged with robbery, assault and conspiracy. Student pled guilty to robbery and criminal conspiracy to commit robbery, was adjudicated delinquent by the Delaware County Court and detained there from May 31 until June 13, 2007. Student then returned to Montgomery County Court, where he had been had recently been placed on probation for theft. . (N.T. pp. 1691, 1692; P-15, P-19)

6.  Based upon the Delaware County adjudication, several prior juvenile court adjudications, including the school bus incident, and a positive test for marijuana, Student was convicted of violating probation and adjudicated delinquent by the Montgomery County Court. Student was remanded to the Montgomery County Youth Center, pending a final disposition hearing. (N.T. pp.831, 1693; P-15, pp. 1, 19)

7.  In July 2007, Student was committed to Glen Mills Schools Residential Program, a community-based juvenile facility located in Concordville, PA, where he remained until April 18, 2008. (N.T. p. 1693; P-15, P-20, S-7)

8.  In March 2009, in response to a peer complaint, verified by camera surveillance, that Student had removed a bicycle from school property, a District administrator called the local police, who charged him with theft. The District also suspended Student for three days. (N.T. pp. 1045, 1046, 1108, 1134, 1693—1695; P-15, p.23, P-20, P-46, p. 1)

9.  On April 3, 2009 Student was adjudicated delinquent, detained at the Montgomery County Youth Center and ultimately committed to the Youth Services of Pennsylvania ACT[1] program located within the Jim Thorpe Area School District, where he remained and received educational services until August 2009. (N.T. pp. 325, 1695, 1696; P-15, P-20, P-26)

**Evaluations Relevant to the Issues in Dispute**

10. In May 2007, near the end of 9th grade the District conducted a psycho-educational evaluation of Student and arranged for a psychiatric evaluation. (N.T. pp. 397, ; S-1, S-2)

11. A District School Psychologist administered the WISC-IV (Wechsler Intelligence Scale for Children-Fourth Edition), which yielded a full scale IQ score of 73, in the borderline range of intellectual functioning. Student demonstrated relative weaknesses in verbal comprehension and perceptual reasoning and relative strengths in working memory and processing speed. (N.T. pp. 414—416; S-2, p. 7)

12  On the initial evaluation in 1st grade, Student's cognitive potential had been measured in the average range. The District's psychologist believed that at the time of the 2007 evaluation, Student's intellectual capacity was likely to be in the low average (80—89) to average (90-100) range. The school psychologist's observation of Student during the testing session led him to believe that Student was not putting forth his best effort on the WISC-IV, possibly because of frustration with his learning experiences and a resulting unwillingness to take risks and otherwise engage in the testing process. (N.T. pp. 416, 419—421, 426, 427, 440, 441; S-2)

13. A language assessment completed as part of the same evaluation yielded scores on a number of subtests that were in the average range, with an overall low average score. The results of the speech/language assessment were inconsistent with the WISC-IV results, lending additional support to the school psychologist's conclusion that the May 2007 FSIQ score was not an accurate assessment of Student's intelligence. (N.T. pp. 418, 419, 526, 527, 529; S-2)

14. The WIAT-II (Wechsler Individual Achievement Test-Second Edition) was also administered to assess Student's academic skills. All subtest scores, measuring reading, math and written language, were significantly or well below average and significantly below expectations based upon Student's cognitive potential. Two additional reading subtests, from the Woodcock Johnson Psycho-Educational Battery III, were also administered, yielding a significantly below average score for Passage

---

[1]  Adventure Challenge Therapy N.T. p. 324

comprehension and a well below average score for Reading Vocabulary. (N.T. pp. 427, 430; S-2, pp. 7, 8)

15.     The District members of Student's IEP team believed that a psychiatric examination was warranted as part of the District's May 2007 reevaluation. Due to Student's disruptive school behaviors, inability to follow rules and lack of academic success, the District wanted to determine whether emotional issues were interfering with Student's educational progress and needed to be addressed in the school setting. (N.T. p. 486; S-1, S-2)

16.     The District agreed with the recommendation in the psychiatric report that Student needed an out of District program that would provide more structure and more individualized attention than available in a large public high school. The District did not pursue an alternative placement at that time because Student was in a court ordered detention in June 2007 and no one on the IEP team was certain when he would return to the District. (N.T. pp. 488, 489, 492, 493; S-1, S-2, )

17.     Pursuant to a juvenile court order, the psychologist for the Montgomery County Juvenile Court conducted an evaluation of Student in June 2007, including re-administration of the WISC-IV, which yielded a full scale IQ of 93, a score suggesting that Student falls into the lower end of the average range of intellectual functioning and would struggle in most academic settings. (N.T. pp. 809—813, 819, 826—828; P-15, P-19)

18.     The court psychologist was unaware that the District's school psychologist had administered the WISC-IV just a few months before and had he known, would not have repeated it due to the "practice effect", *i.e.*, the possibility that familiarity with the test might affect the score. In response to the court psychologist's Student denied that he had been a special education student in the District and that he had ever been previously evaluated. (N.T. pp. 437, 439, 808, 809; P-19)

19.     Neither the court psychologist nor the District school psychologist believes that familiarity with the WISC-IV could account for the 20 point discrepancy between the District's and the court's FSIQ scores. Factors that might also have affected Student's greatly improved performance the second time include Student's increased comfort level with taking the test and the desire to do well in the hope that cooperation with the court-ordered evaluation would result in a more favorable disposition of the criminal charges. (N.T. pp. 439, 442, 522, 523, 807, 820)

20.     When Student returned to the District in April 2008, a new evaluation was proposed to obtain updated information after Student's lengthy absence from the high school. Although the evaluation was conducted in September 2008, after Parent signed the permission to reevaluate at the beginning of Student's 11th grade year, Student declined to participate in additional testing despite the efforts of teachers, administrators and Parent to encourage his cooperation. (N.T. pp. 239--445—453, 497, 498, 510, 518—521; S-18)

21.   The reevaluation in the fall of 2008 consisted primarily of a review of records, information from Parent, from Student's 11th grade teachers concerning his academic progress and behavioral functioning and a classroom observation.   (N.T. pp. 508—512, 516, 517; S-18)

22.   In November 2009, after the due process hearing was underway, Parent procured an independent psycho-educational evaluation of Student by a nationally certified school psychologist in private practice. (N.T. pp. 1999, 2000, 2062; P-53)

23.   The independent evaluator administered the WAIS-IV (Wechsler Adult Intelligence Scale, Fourth Edition), from which he determined that Student's general ability level is in the low average to average range of intellectual functioning, with a full scale IQ score of 82. Student demonstrated a relative weakness in verbal comprehension, which was in the deficient to low average range, and a relative strength in perceptual reasoning, which was solidly in the average range. (N.T. pp. 2009, 2010, 2013, 2014; P-53, pp. 6, 13)

24.   Academically, Student was functioning on approximately the 5th grade level based upon the WIAT-III (Wechsler Individual Achievement Test-Third Edition). Student's highest score was a grade equivalent of 8.4 in the essay composition subtest, which does not include grammar and writing mechanics. Student's total achievement in reading, math and writing was classified as below average. (N.T. pp. 2009, 2021--; P-53, pp. 7, 13)

25.   The independent evaluator also asked Student and Parent to complete rating scales to measure Student's adaptive functioning in school, home and community settings. The results were consistent with information in Students' records.   (N.T. pp. 2031; P-53, pp. 14, 15 )

26.   The measures of emotional functioning confirmed that Student is at risk for conduct disorder, consistent with the diagnosis made by the court psychologist. Response bias on the self concept rating scale and the depression inventory led the independent evaluator to conclude Student was masking negative feelings and shows signs of depression, despite scores on the depression inventory that fall short of the "at risk" category. (N.T. pp. 2039—2042; P-19, P-20, P-53, pp. 8, 9, 12)

27.   The evaluator did not observe Student in school because he did not attend on the day the observation was scheduled. The teachers did not receive the questionnaires sent to them through Parent's counsel in enough time to complete them for inclusion in the report completed on December 15, 2009. (N.T. pp. 2044, 2076, 2078; S-62)

28.   The independent evaluator identified personal issues that could affect Student's educational performance but are not the responsibility of the District and recommended that family issues such as Student's feelings about the absence of his father be addressed in private psychotherapy. (N.T. p. 2160; P-53, p. 9)

### 10th Grade-2007/2008 School Year

29      During most of the 2007/2008 school year, Student was educated in the court ordered
        placement at Glen Mills. Student was enrolled in 6 academic classes covering math,
        reading, writing, oral communication, science and geography, in which he earned Bs and
        Cs. Student also took PE/Health and participated in a vocational program. (N.T. pp. 899,
        921; S-8, p. 5)

30.     When Student returned to the District near the end of his 10th grade year, an IEP team
        meeting was held on April 24, 2008 to plan for Student's transition back to the District
        for the remainder of the school year and determine Student's program going forward.
        There was a discussion at the meeting concerning the recommendation in the 2007
        reevaluation report for an out of District placement, and the District's request to conduct
        a reevaluation prior to planning for the following school year. A permission to reevaluate
        was sent to Parent several days later. (N.T. pp. 214, 500, 501, 734, 965, 1169—1172; S-
        8, S-9)

31.     Parent refused an out of District placement at that time. Parent thought that the District
        was proposing an alternative school similar to Glen Mills. (N.T. pp. 501, 963, 1323;)

32.     At the IEP meeting, which was attended by Student and Parent, it was agreed that
        Student would enter the regular 10th grade classes for the remainder of the school year.
        The IEP included a transition plan and goals in the areas of organization, self-advocacy,
        developing coping strategies, reading, writing and math. Itinerant emotional support at
        the rate of one 45 minute session/week and social work services for transition planning at
        the rate of one 45 minute session every three weeks were provided as related services.
        (N.T. p. 1509; S-8)

33.     The emotional support teacher began meeting with Student in mid-May 2008 and met
        with him during the remainder of the school year, working particularly on trying to build
        a good relationship as well as developing coping strategies, including anger management.
        Student was cooperative, discussed anxieties about returning to school and identified
        additional issues to discuss. (N.T. pp. 1510—1520; P-58, S-8)

### 11th Grade—2008/2009 School Year

34.     The April 24, 2008 IEP remained in place during the following school year until
        Student's IEP team met in September 2008. No significant revisions were made at that
        time, pending completion the District's requested reevaluation, for which Parent signed
        the PTRE form at the IEP meeting. (N.T. pp. 85—87, 504; S-8)

35.     Student was enrolled primarily in regular education 11th grade classes, two of which were
        co-taught by a regular and education teacher. Student was also assigned to two
        instructional support labs (ISL) daily for additional academic support by the special
        education teacher who served as his case manager. (N.T. pp. 62, 90, 91, 96, 217; S-25, )

36.   Specially designed instruction as specified in Student's IEP was provided by the special
      education teacher/case manager in the course of her co-teaching in Student's English III
      class.   (N.T. pp.62—65, 70, 224)

37.   Student's special education teacher/case manager and another special education teacher
      provided additional support in the ISL classroom for chemistry and math, to fulfill the
      skill building and goal remediation functions of the ISL.   The math goals in Student's IEP
      were implemented by the regular education teacher in Student's Algebra I class.   Because
      Student was struggling, he was offered the opportunity to work with one on one with a
      District math specialist, but after one or two sessions declined to do so.   (N.T. pp. 79—
      83, 228—231, 915, 916, 1607—1617)

38.   Study skills were taught in the ISL classroom, and Student also received instruction to
      meet his organization and self-advocacy goals.   (N.T. p. 232, 233; S-8)

39.   Several weeks into the school year, Student began to find reasons not to meet with the
      itinerant emotional support teacher.   The emotional support teacher discussed Student's
      reasons for not wanting to keep his appointments.   Although Student confirmed in his
      hearing testimony that the emotional support teacher worked on strategies for helping
      him manage frustration and that he liked her, he did not feel that he needed the sessions.
      Student also reported to the teacher that he felt there were too many people trying to help
      him.   (N.T. pp. 269, 916, 917, 1520—1522, 1527)

40.   Since Student was not meeting with the emotional support teacher because he appeared to
      be feeling overwhelmed by the number of people working with him, the emotional
      support teacher met with Student and his case manager to consider alternative means of
      meeting Student's emotional support needs.   They agreed that if Student identified issues
      for which he needed support, he would first discuss them with his case manager, who
      would then initiate meetings with the emotional support teacher if she felt that would be
      helpful to Student.   The emotional support teacher continued to offer Student the
      opportunity to meet with her and maintained regular contact with his special education
      teacher/case manager.   (N.T. pp. 1522, 1523, 1528, 1529, 1532)

41.   During the fall of 2008, Student began requesting a change of placement to a part-time
      work experience program.   After discussion at IEP team meetings on December 22, 2008
      and January 29, 2009, Parent signed a NOREP permitting the change.   (N.T. pp. 244—
      246, 900, 901, 1184—1187, 1196, 1524, 1525; S-25, S-26, S-60, S-61)

42.   Through the District's transition coordinator, Student was placed in a volunteer program
      at Lankenau Hospital, where he serves as a messenger.   (N.T. pp. 279, 868, 869, 1771—
      1773, 1778; S-25, S-26)

43.   From January 2009 until April, when Student again left the District for a juvenile court
      ordered placement, Student attended academic classes in the morning and worked hours
      at Lankenau every school day.   Student did very well in the hospital volunteer position.
      (N.T. pp. 1785—1787, 1808)

44.   At the December 22, 2008 IEP meeting, the District members of the IEP team proposed changing Students emotional support from direct to collaborative services for one 30 minute session/month due to Student's reluctance to meet with the emotional support teacher and to accommodate the half-day school attendance and half day work experience program. (N.T. pp. 283, 1529—1533; S-25, S-26 )

45.   The direct reading instruction Student had been receiving in an academic literacy class in the spring of 2008 and during the first half of the 2008/2009 school year was eliminated when his schedule was changed to accommodate an afternoon work experience program. (N.T. pp.227, 278; S-25)

46.   Student's special education teacher noted progress in reading and writing during the 2008/2009 school year, but progress toward organizational and study skills development and coping skills was minimal. Student's greatest progress occurred in the area of developing self-advocacy skills. (N.T. pp. 288—290, 1526, 1527)

**12th Grade—2009/2010 School Year**

47.   When Student returned to the District in September 2009, he was again enrolled in the regular education classes in the morning and Lankenau work experience program in the afternoon pursuant to the January 29 IEP. (N.T. pp. 291, 292; P-, S-25, )

48.   Although Student believes he is currently enrolled in the same math class, he completed in the ACT placement's educational program, his counselor confirmed with the teacher from that program that Student's course there was the equivalent of the District's Introduction to Algebra class, not the District's Algebra I class in which Student is currently enrolled. Student may have also taken an Introduction to Algebra course at Glen Mills. Algebra I is a two year course in the District. Student was enrolled in the second year of the sequence during the 2008/2009 school year, but at the time Student was detained by the juvenile court in April 2009, he was not passing Algebra I and is repeating it in the current school year. (N.T. pp. 293, 294, 871, 1150—1152, 1155, 1232—1234; P-, S-, )

49.   Student resumed the half-day work experience program at Lankenau Hospital at the beginning of October 2009. After missing a day each week for two weeks, Student asked to reduce the work experience hours, initially to four and then to three days/week. (N.T. pp. 1808, 1813, 1814)

**Behavior/Discipline**

50.   The 2007 and 2008 reevaluation reports both included a section that the District school psychologist captioned "Functional Behavioral Assessment" (FBA), consisting of a description of behaviors of concern, such as cutting classes, not completing work and aggression/defiance and the perceived function of those behaviors. The FBA identified frustration with the learning process as the underlying reason for Student's lack of engagement in his academic classes and acting out behaviors. The school psychologist

9

concluded that Student's desire to preserve positive feelings about himself interfered with his willingness to take the risks necessary to acquire new information and demonstrate mastery. The IEP team has been unable to identify positive reinforcements that can be consistently implemented throughout the school year and are sufficiently motivating to Student to encourage him to overcome the behaviors that interfere with his learning. (N.T. pp. 530, 610, 611, 625, 1072; S-2, p. 12, S-18, p. 10)

51. The District has been able to achieve limited success in motivating Student to maintain appropriate school behaviors by using eligibility for sports, particularly football, as an incentive for attending class and completing school work. (N.T. pp. 220, 221,1062—1064, 1200)

52. Although Student's aggressive and defiant behaviors generally decreased after Student returned from the Glen Mills placement, other behaviors related to academic issues, such as cutting class and refusing to complete school work/homework persisted in the absence of incentives that are meaningful to Student over the long term. (N.T. pp. 264, 1206, 1219; P-, S-18, p. 10)

53. After the 2008 football season ended, Student's negative behaviors, including refusing to complete school work and homework, cutting classes and acting out increased. There were 20 disciplinary referrals between mid-November 2008 and the end of January 2009, but only one incident of cutting class reported from the beginning of the school year until November 17, 2008 (N.T. p. 1187; P-46, pp. 1, 2)

54. Concluding that consequences such as suspensions are ineffective in motivating Student, a District vice principal has worked with Student to develop the structure Student needs to successfully maintain appropriate school behaviors, attend class and complete school work, as well as to understand the long-term consequences of uncontrolled negative behaviors. (N.T. pp. 1062—1069, 1202, 1203)

55. During the winter and early spring of 2009, Student was also motivated by the work experience program that allowed him to spend half days in school and half days working as a hospital volunteer. (N.T. pp. 280, 1201, 1202)

56. After a difficult start to the current school year, including an early out of school suspension, Student's school behaviors and performance improved. (N.T. pp. 295, 296, 298, 308, 1137—1151, 1220; P-46, p. 1)

**Transition Planning/Services**

57. The District's transition coordinator first became involved in providing services to Student at a September 2008 IEP meeting, the beginning of Student's 11th grade year. Transition planning was the primary focus of that meeting. (N.T. pp. 216, 1745, 1752; S-58)

58.    The transition coordinator contributed information to include in the IEP discussed at the
       December 22, 2008 IEP team meeting. (N.T. p. 1754; S-25)

59.    Student's half day work experience program at Lankenau Hospital is part of his transition
       program. The work experience permits Student to learn and practice basic employability
       skills such as punctuality, attendance, taking direction, asking for clarification,
       advocating for workplace needs. (N.T. pp. 1773, 1774, 1779, 1780)

60.    Student was provided with a job coach who started working on employment skills with
       him before he began at Lankenau and accompanied him to Lankenau each day until it
       was determined that Student could independently perform the required duties. The job
       coach interpreted directions, suggested work strategies, such as requesting additional
       tasks when one was completed and collected data on Student's ability to independently
       demonstrate job skills. (N.T. pp. 1779—1782, 1786)

61.    The transition coordinator and job coach also helped Student prepare a resume, research
       job openings and apply for jobs, including a paid position at Lankenau.  (N.T. pp.
       1782—1784, 1788)

62.    During the 2009/2010 school year, Student again worked with a job coach, focusing on
       maturity skills. (N.T. pp.1810)

63.    Student completed interest inventories and participated in the SAGE[2] assessment
       conducted by the Montgomery County Intermediate Unit (MCIU). (N.T. pp. 1434—
       1440, 1800, 1801; S-25)

64.    The transition coordinator took Student to a community college symposium for students
       with disabilities planning to attend college. The District also sponsors college fairs that
       Student attended. (N.T. pp. 1794—1796, 1798)

65.    During the current school year, Student expressed a stronger interest in attending college.
       (N.T. p. 1812)

## DISCUSSION AND CONCLUSIONS OF LAW

The IDEA statute and regulations provide procedural safeguards to parents and school

districts, including the opportunity to present a complaint and request a due process hearing in

the event special education disputes between parents and school districts cannot be resolved by

other means.  20 U.S.C. §1415 (b)(6), (f); 34 C.F.R. §§300.507, 300.511; *Mary Courtney T. v.*

*School District of Philadelphia*, 575 F.3d 235, 240 (3rd Cir. 2009)

---

[2]  System for Assessment and Group Evaluation

In *Schaffer v. Weast*, 546 U.S. 49; 126 S. Ct. 528; 163 L. Ed. 2d 387 (2005), the Supreme Court established the principle that in IDEA due process hearings, as in other civil cases, the party seeking relief bears the burden of persuasion. Consequently, in this case, because Parent has challenged the appropriateness of the District' program/placement Parent must establish that the District's program/placement is not reasonably calculated to assure that Student will receive a meaningful educational benefit from the proffered services.

Since the Court limited its holding in S*chaffer* to allocating the burden of persuasion, explicitly not specifying which party should bear the burden of production or going forward with the evidence at various points in the proceeding, the burden of proof analysis affects the outcome of a due process hearing only in that rare situation where the evidence is in "equipoise," *i.e.,* completely in balance, with neither party having produced sufficient evidence to establish its position.

## I.   Preliminary Issues

Prior to considering the program and placement issues that comprise the primary matters for decision, there are several underlying issues raised by each party that must be addressed.

### A. Parent Participation in IEP Meetings

Parent's counsel contended throughout the hearing that Parent was prevented from meaningful participation in Student's IEP meetings because she frequently did not understand the discussions and was unable to read and understand the documents she was asked to sign. Parent notes, e.g., that when the District suggested a private school placement for Student in early 2009, she believed the District was referring an alternative educational facility similar or identical to a juvenile detention facility, and was, therefore unwilling to agree to the suggestion. F.F. 31

12

Parent argues that because she is a former special education student who attended school in the same School District, the District should have known that she would be unable to read the IEPs and other documents, or understand the discussion of various issues at the IEP meetings. Parent further argues that the District denied her right to fully participate in IEP meetings because it failed to comply with 34 C.F.R. §300.322(e), the federal IDEA regulation which provides that,

> The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English.

Although Parent is entitled to understand the IEP proceedings, it is unreasonable and unrealistic to expect the District to know that Parent had difficulty reading the IEPs and evaluation/reevaluation reports and otherwise understanding the content of the IEP meetings unless she either informed the District or there is evidence to establish that the District knew or reasonably should have known, based upon its dealings with Parent in the context of her participation in IEP meetings, that Parent did not understand the proceedings. Parent admitted, however, that she hadn't told the friend who helped her, her advocates or her counsel, that she has difficulty reading until the fall of 2009. (N.T. p. 1313) In addition, although both Parent and her friend who sometimes accompanied her to IEP meetings testified that District members of the IEP team sometimes resisted when Parent asked to have things repeated and re-explained, Parent's friend also testified that other IEP team members from the District were willing to continue explaining matters that Parent did not understand. (N.T. pp. 1316, 1390, 1401)

Since Parent did not explicitly inform the District of her inability to read the IEPs and other documents, or that she generally did not understand the proceedings even after further explanation, Parent argues that the District should have known that she would have difficulty

13

understanding oral and written communications because had been a special education student when she attended District schools. Accepting that premise and concluding that the District violated Parent's right to participate in the IEP process because it failed to act on its purported "knowledge" that Parent did not fully understand the proceedings is unwarranted and would place an unreasonable burden on the District. First, accepting Parent's argument would mean that the District must always assume that a parent who was provided with special education services in public school will be unable to read or fully understand oral communications. That assumption would require the District to further assume that it is never successful in preparing its special education students to overcome or remediate their disabilities sufficiently to participate independently in activities such as IEP meetings for their own children.

In addition, Parent did not suggest anything more that the District could or should have done in this case to meet its obligation to ensure Parents' understanding of the IEP process, or how the District can ever be certain that it has met its obligation when a parent is a former special education student. Here, Parent signed several NOREPs indicating her agreement with the program/placement recommendations discussed at IEP team meetings in which she participated, but later testified that she did not fully understand the program she was accepting for Student. Parent made no attempt to explain how the District should have known that she still did not actually understand IEPs or evaluation reports after she stopped asking for explanations and indicated her agreement with the reports or proposed IEPs. In the absence of objective criteria for ascertaining when a parent understands the IEP proceedings, no school district could ever reasonably conclude that a former special education student fully understands the program he or she accepts on behalf of his/her child. It is manifestly unreasonable to impose an obligation that a district can never meet with a reasonable degree of certainty and that is not

based upon any objective criteria. Parent contends, in essence, that a district interferes with a parent's full participation in the IEP process any time a parent later asserts a lack of understanding of some aspect of past IEP proceedings. A district's compliance or noncompliance with IDEA requirements cannot be based upon such a subjective and obviously self-serving standard.

Moreover, during the period in dispute in this case, Parent never attended an IEP team meeting unaccompanied by counsel and/or an advocate or friend. *See* S-8, p. 3; S-25, p. 3; S-53, p. 3; S-56; S-58, p. 2; S-60 p. 2. Parent's friend testified that she will ask questions at meetings when she believes Parent may not understand something and speak with her about the meeting later. (N.T. pp. 1387—1389, 1391) There was uncontradicted testimony that one of Parent's attorneys told the District that no one from the District should speak to Parent about Student's program or ask her to consent to anything except in the presence of one of her attorneys or advocates. (N.T. p. 162) IEP meetings were sometimes delayed because an attorney or advocate was unavailable to attend with Parent. (N.T. p. 248) Under such circumstances, the District was certainly entitled to conclude that if Parent needed help in understanding any aspect of the IEP process, she had readily available resources for obtaining whatever assistance she needed.

Parent cited no statute, regulation or decision that supports her sweeping conclusion that the District was not only obligated to ensure Parent's understanding of proposals and decisions, but was also required to assure that Parent's understanding came directly from District communications without expecting Parents' attorneys and advocates to assist her in understanding the IEP discussions and documents.

The reasons Parent asserted in support of her contention that she was denied full participation in the IEP process due to the District's failure to ensure her understanding of

documents and oral communications presented at IEP meetings are unsupported by the law, and in light of the evidence in this case, devoid of reason and logic.

B. Lower Merion's Responsibility for Student's Juvenile Court Involvement and for Student's Education During Out of District Juvenile Detention Placements

Parent constantly alluded to the District's role in Student's juvenile court commitments to Glen Mills for most of 2007/2008 school year and to the ACT program beginning in April 2009, presumably to suggest that the District's decision to notify police of Student's involvement in events that resulted in criminal charges and subsequent adjudications of delinquency violated IDEA and can support an award of compensatory education for the periods Student was in court-ordered residential placements. Parent's position, however, is contrary to the IDEA statute and regulations, which explicitly provide that,

> Nothing in this part prohibits an agency from reporting a
> crime committed by a child with a disability to appropriate
> authorities or prevents State law enforcement and judicial
> authorities from exercising their responsibilities with regard
> to the application of Federal and State law to crimes committed
> by a child with a disability.

20 U.S.C. §1415(K)(6); 34 C.F.R. §300.535(a). There is no legal basis for concluding that the District was responsible for Student's absence from school for most of his sophomore year and a the last two months of his junior year, and, therefore, that the District is obligated to provide him with compensatory education for the periods he was absent due to juvenile court commitments.

Moreover, the first incident reported to the police led to a brief period of detention that occurred prior to the period for which compensatory education could be awarded in this case. The adjudication and probation resulting from that incident had only an indirect effect on Student's subsequent court placement at Glen Mills, in that it was one of several offenses for which Student was on probation that he violated by his involvement in two subsequent crimes

16

that actually precipitated the Glen Mills placement. F.F. 5, 6  Those offenses had nothing to do with the District.

Finally, an eligible student's school district of residence is not responsible for providing either a special or regular education program when the student is an inmate in an out of district residential facility, such as Glen Mills, Montgomery County Juvenile Detention Center or the ACT program. Pennsylvania statutory law places the responsibility for educating all students detained in juvenile residential facilities on the "host" school district, *i.e.*, the district in which the facility is located. 24 P.S. §13-1306(a). The host district's responsibility explicitly includes providing special education services to eligible students. 24 P.S. §13-1306(c). Neither Glen Mills, the Montgomery County Juvenile Detention Center nor the ACT facility are located within the Lower Merion School District. Since the District was not responsible for Student's educational program during those periods of commitment, no compensatory education may be awarded in this case before the date in April 2008 when Student returned to the District or between April 3, 2009 and the end of the school year in June 2009.

C. Issues Not Raised in Parent's Complaint

The District argues that Parent cannot raise claims based upon inappropriate transition services, inappropriate discipline/number if disciplinary referrals Student received or upon denial of ESY services. Although it is accurate that no claim for denial of ESY services was asserted in the complaint, Parent did not argue in either the opening statement or Post-Hearing Submission that Student was eligible for ESY services during the summer of 2008. Similarly, Parent asserted no claim or argument based upon disciplinary referrals, such as District suspensions that amounted to a change of placement without conducting a manifestation determination review.

17

Parent's complaint asserted, generally, that Student failed to make meaningful academic progress during the 2007/2008 and 2008/2009 school years and that the District should provide compensatory education for those school years. Since both a lack of appropriate behavior support and inadequate transition services can be part of the basis for an alleged denial of an appropriate program and placement and can support a claim for compensatory education, the alleged deficiencies in the District's program in those areas are fairly within the claims asserted in the complaint. In addition, the complaint asserts that the only transition activities provided to Student throughout the period in dispute were the SAGE assessment and the Lankenau Hospital volunteer placement for part of the school day during the 2008/2009 school year. There is, therefore, no basis for precluding substantive consideration of the adequacy of the transition services provided to Student, as well as the adequacy of the District's efforts to address Student's behaviors that allegedly interfered with his academic progress.

D. Compensatory Education for the 2009/2010 School Year

When the complaint in this case was filed on July 1, 2009 Parent requested a private school placement for the current school year due to an allegedly inappropriate program resulting in denial of FAPE for the current school year. That is no longer a feasible remedy because most of the current school year has passed and a new placement could not be arranged before the current school year ends. If FAPE was indeed, denied, it would be an unreasonable exaltation of form over substance to deny Student a real remedy in the form of compensatory education. Because the hearing required numerous sessions and was not concluded until mid-January 2010, Parent's request for a private school placement for the current school year must, at this point, be transformed to a claim for compensatory education as an appropriate remedy for denial of FAPE during the current school year.

## II.    Independent Evaluation

Parent first requested an IEE at public expense by letter dated June 17, 2006, and included that request in her July 1, 2009 due process complaint. (S-46, P-21).  The District refused the IEE request by letter dated July 8, 2009 and offered to conduct a reevaluation. (S-47, S-48).  The District did not initiate its own due process complaint to support the appropriateness of its own evaluation in accordance with 34 C.F.R. §502, but defended its most recent reevaluations of Student throughout the due process hearing on Parent's complaint.  Accordingly, Parent was permitted to present the report and testimony of an independent psychologist who evaluated Student in November 2009 in response to the District's denial of the IEE. (HO-1)  Since Parent has already obtained the IEE, her request now is for reimbursement for the costs of that evaluation.

Parent argues that the District did not properly evaluate Student and identify all needs, particularly after he returned from two juvenile court placements.  The record, however, does not support that conclusion.  Although the District's May 2007 reevaluation, the most recent in which standardized testing was completed, yielded an IQ score in the borderline range, much below the previous assessment of average intellectual functioning, the District's school psychologist recognized that the score was anomalous and concluded that Student's true FSIQ was more likely in the low average to average range.  F.F. 11, 12, 13  Two and a half years later, Parent's independent evaluator came to the same conclusion, based upon the standardized test scores he obtained.  F.F. 23  In making his determination, the evaluator noted Student's low average FSIQ score of 82 on the WAIS-IV, as well as the discrepancy between Student's verbal comprehension score of 74 and his perceptual reasoning score of 100.  F.F. 23  The independent evaluator's test results and conclusion with respect to Student's intellectual functioning provided

no new information to either Parent or District. Moreover, because the Parent's independent evaluation was not only obtained well after the District's 2007 evaluation, but more than a month after the District's school psychologist testified at the due process hearing, there can be no suggestion that the District's psychologist conformed his conclusions to the outcome of the independent evaluation. There is, therefore, no question that the District psychologist's assessment of Student's true cognitive potential provided a sound basis for planning Student's program at all times since the 2007 evaluation was completed.

The results of standardized achievement tests conducted by the District in 2007 and by the independent evaluator in 2009 were also similar. F.F. 14, 24 The District recognized and attempted to address Student's significant deficiencies in academic functioning at all times that Student was attending high school in the District. The independent evaluator's conclusion, based on the recent standardized achievement tests, that Student is functioning well below grade level confirms the results of the District's standardized achievement tests. Surprisingly, however, given the well-documented difficulties motivating Student and engaging him in the learning process during the 2008/2009 and 2009/2010 school years, Student's standard scores and percentile rankings actually increased in reading, math and writing, the academic areas assessed by the WIAT-II, given by the District in 2007, and the WIAT-III, given in November 2009 by the independent evaluator. Since Student remains far below the academic levels expected based upon age and intellectual capacity, because different versions of the test were administered, and because neither party elicited testimony comparing the evaluation results and explaining the significance, if any, of the increases in the standard scores and percentiles, it is impossible to draw the conclusion that the more recent test results establish that Student made significant academic progress. It does appear, however, that Student made at least minimal gains, based

upon a comparison of the standardized measures of academic achievement given in 2007 and 2009, and certainly did not regress.

Finally, the conclusions in both the District's 2007 and 2008 evaluations and the independent evaluation concerning the role of emotional factors in Student's academic and behavioral difficulties are similar. Both evaluators clearly understand that whatever personality or emotional factors contribute to Student's lack of motivation, disengagement from the educational process, and especially Student's unwillingness to admit that he needs the special education supports offered to him, substantially interfere with Student's ability to make better academic progress. Although the school psychologist's assessment of those emotional factors is not a "Functional Behavioral Assessment" as that term is commonly used, the conclusions in those portions of the District's 2007 and 2008 evaluation reports accurately describe the nature of the emotional problems that interfere with Student's performance in school, and the District's conclusions are similar to those of the independent evaluator—Student lacks confidence in his ability to read and perform other academic tasks, becomes frustrated by his lack of success and tries to protect his self-esteem by avoiding situations where he believes he will be unsuccessful, primarily academic tasks. *Compare*, S-2, p. 12; S-18, p. 10; P-53, pp. 8, 9; N.T. pp. 2041, 2042.

In light of the similarities in results and conclusions between the District's evaluations in 2007 and 2008, and the independent evaluation, there was no need for the District to provide an independent evaluation at public expense. The District's evaluations provide sufficient and appropriate information for Student's IEP team to identify Student's disabilities and the needs arising from those disabilities, as well as guide the development of a program reasonably calculated to meet his needs.

In addition, the primary purpose of the evaluation, report and testimony of Parent's expert was to argue that the District's program and placement proposals, not its evaluations, were flawed, and to offer opinions in support of the remedies Parent seeks. At this point, parents are not entitled to reimbursement for expert testimony designed to support claims for private school tuition, compensatory education or other programs/placements they believe would be appropriate. *Arlington Central School District v. Murphy*, 548 U.S. 291, 126 S. Ct. 2455, 165 L.Ed. 2d 526 (2006). Support for Parent's denial of FAPE claims was clearly the thrust of the independent evaluator's testimony and of the evaluation report, which included four pages of program/placement recommendations. Parent's claim for reimbursement for the independent evaluation is, therefore, denied.

### III.   Appropriateness of the District's Programs

A. Academic Instruction/Emotional Support

In this case, Parent is essentially asserting a kind of "strict liability" claim. Parent argues that because Student remains far below grade level in basic academic skills, he did not make meaningful educational progress, which in turn, establishes that the District failed to provide an appropriate program and placement.

It is true that an eligible student is entitled to receive a free appropriate public education (FAPE) from the responsible local educational agency (LEA) in accordance with an appropriate IEP, *i.e.*, one that is "reasonably calculated to yield meaningful educational or early intervention benefit and student or child progress." *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982); *Mary Courtney T. v. School District of Philadelphia*. "Meaningful benefit" means that an eligible child's program affords him or her the opportunity for "significant learning." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3RD Cir. 1999). In this case,

22

the key language in the applicable legal standard are the phrase "reasonably calculated" and

"opportunity."   Contrary to Parent's argument, the District is not held to the impossible standard

guaranteeing meaningful progress  Under the interpretation of the IDEA statute established by

*Rowley* and other relevant cases, the District not required to provide an eligible Student with

services designed to provide the "absolute best" education or to maximize the child's potential.

*Mary Courtney T. v. School District of Philadelphia; Carlisle Area School District v. Scott P.*,

62 F.3d 520 (3ʳᵈ Cir. 1995).

In most respects, the District met the legal standards for offering FAPE in this case by

providing detailed IEPs with annual goals designed to meet Student's needs arising from both his

learning disabilities and emotional disturbance. Unfortunately, the District's efforts were not

entirely successful, due, primarily, to the nature and severity of Student's emotional disturbance

disability, which prevents Student from recognizing the severity of his academic needs, leading

him to reject most of the supports and services the District offered him during the 2008/2009 and

2009/2010 school years.[3]

In three respects, however, the District fell short of properly implementing the IEPs it

offered.  Beginning in February 2009, the District eliminated additional reading instruction. F.F.

---

[3]   Although the 2007/2008 school year is encompassed within Parent's claim, there is no issue concerning an
appropriate program for most of that school year, since Student was in a court-ordered out of District residential
placement until April 2008.  As discussed above, the District had no responsibility for providing a program for
Student during that period.

The temporary program developed for the few remaining weeks of that school year was primarily designed
for and directed toward facilitating Student's transition back to the District, and Parent produced no evidence that
the services and supports the District provided did not meet that goal.  .

Finally, because the applicable legal standards require the District to offer a program/placement reasonably
calculated to result in meaningful progress and permits a school district a reasonable period to correct any
deficiencies that may come to light as the program is implemented, and because as written the IEP addressed all
needs and provided sufficient means for meeting them, the District's period for revising the IEP would have
extended beyond the end of the school year. For all of the foregoing reasons, there is no basis for an award of
compensatory education for any period during the 2007/2008 school year.

45. Student, however, remains far below grade level in reading, and it is likely that his reading difficulties significantly contribute to his disengagement from the learning process.

Although Student's work experience program has been very positive him, and it is difficult to assure that he receives all necessary academic instruction in only half a school day, and there is little doubt that Student would have, and will resist, additional reading instruction, he clearly needs it and it must be offered, and Student assigned to work with a teacher daily at a specific time.

The District, therefore, will be ordered to provide Student with daily intensive reading instruction equal to the length of an academic literacy class for the remainder of the current school year, and provide compensatory education for insufficient reading instruction from January 29, 2009 to the date the Student left the District for the ACT program in April 2009, and from the first day of school in the current school year through the date intensive reading instruction begins.

Student has also struggled in math to the extent that he is only now on track to pass Algebra I this year. The District offered additional math instruction by a math specialist, but Student declined the services. As with reading, the District must set aside a period each day for Student to work with the math specialist and leave the time to Student's choice. The District will also be ordered to provide Student with compensatory education in the form of math instruction equal to the length of a regular class period from the beginning of the 2008/2009 school year through the date Student left the District in April 2009 until the date the additional period of math instruction begins.

Finally, Student needs the emotional support services he rejected, and the District will be ordered to reinstate those services and provide Student with a 30 minute period of emotional

24

support services each week, and compensatory education in the form of 30 minutes of emotional

support or counseling services each week from November 1, 2009, the approximate time Student

began refusing services through the date Student left the District in April 2009 and from the

beginning of the current school year until services begin.

  B. Transition Services

   It is questionable whether the lack of an adequate transition plan can support a denial of

FAPE under the interpretation of the applicable legal standards adopted by the Court of Appeals

for the Third Circuit. *See High v, Exeter Twp. School District* 2010 WL 363832 (E.D.Pa. Feb. 1,

2010). Regardless, the District in this case provided Student with appropriate transition services,

including the work experience program at Lankenau Hospital. Since Student has recently

requested to reduce his hours and has recently begun expressing more interest in college, it is

possible that the employment experience had the effect of helping him develop a better idea of

the future he wants to pursue. F.F. 49, 65   If that is the case, the transition services the District

is providing are serving their intended purpose. Transition services are designed to be a process

through which a student begins to plan effectively for life as an adult, including exploring

interests likely to lead to realistic future educational and/or employment goals. The District's

transition plan is reasonably calculated to fulfill that purpose.   Student has been provided with

interest assessments and experiences designed to explore his interests and develop employment

skills, which he will ultimately need even if he pursues a college education first.   F.F. 59-64

**IV.** <u>**Continued IDEA Eligibility/Future Program**</u>

   Testimony during October 2009 due process hearing sessions indicated that Student was

lacking sufficient credits to graduate in June 2010, and that there was no IEP in place to support

Student's graduation from high school at the end of this school year. *See*, N.T. pp. 1234—1238,

1241—1244, 1259, 1261, 1265. There was no evidence later in the hearing from either party to contradict the testimony of the District's witness in that regard. Nevertheless, although Parent concluded her argument by requesting two additional years of education at a private school of her choice, and the District opposes a private school placement, the District's closing argument was silent with respect to whether Student should/will have continued eligibility after this school year. *See* Parent's Post-Hearing Submission at p. 77; Closing Argument of the Lower Merion School District, pp. 1—41.

The matter of an appropriate program for Student going forward, however, must be carefully considered. As all witnesses for both parties recognized in their testimony, Student is clearly still lacking in basic reading, writing and math skills, as well as sufficient credits to meet District graduation requirements. In addition, Student remains eligible for special education services until he meets his current IEP goals or reaches age 21. On the other hand, Student's testimony clearly indicated that he expects to graduate on time at the end of the current school year. According to the conclusions of both the District's school psychologist and Parent's private evaluator, there are emotional psychological factors that prevented Student from accepting and taking full advantage of the educational opportunities offered to him as an IDEA eligible student. F.F. 28. As discussed above, the District's IEPs have been largely appropriate. There is no basis, therefore, for ordering a private school as a remedy for past denial of FAPE.

The question of an appropriate program and placement going forward, however, is more problematical. There is nothing in the record to indicate that Student is presently any more receptive to the District's efforts to provide the academic and emotional support services he needs than he has been during the past two school years, much less that he will be willing to return to the high school setting from which he intends to graduate in June for an additional year

or more of secondary education. Unless Student becomes reconciled to the need to remain in an

IDEA placement until his basic academic skills are better developed and he meets graduation

requirements, no program is likely to be successful for him. Student's inability to fully benefit

from the educational services provided to him appears to be part of his ED disability. Parent has

provided no evidence to support a conclusion that ordering two additional school years of

education at an unspecified private school selected by Parent is any more likely to assure that

Student will overcome his disability and develop the academic, behavioral and coping skills

Student needs to be successful in adulthood than the programs that the District has provided in

the past or could provide in the future. Consequently, although it is possible to order that IDEA

services continue for at least one additional school year, it is impossible to discern the kind of

program, services and setting that would be reasonably calculated to yield meaningful

educational benefit, since Student's disability is likely to make him even more resistant to

continuing his IDEA services in the future than he was in the past.

Given the District's experience with Student and its knowledge of his needs and how his

disability adversely affects his ability to successfully access the services offered to him, the

District, as well as Parent, needs to be involved in developing a future program for Student

through the IEP process. The record provides much valuable information about Student that the

parties need to keep in mind in developing an appropriate program going forward. Student needs

highly structured, small group or individualized instruction in math and reading, where he

remains far below grade level. Student also needs to develop sufficient trust that he can improve

his basic academic skills and be successful despite his frustration and denial that he still needs

extensive help. Student needs effective emotional support services.

Both parties need to be receptive to finding or developing a program and placement that can address Student's needs. Although it may be possible for the District to provide such services, having Student return to his current high school for another year or more of academic instruction is not reasonably likely to be successful. Consequently, the IEP team will be ordered to consider alternative settings and methods, such as another public high school, tutoring services or a private placement. The additional services must also include a transition plan, which may be the same or similar to the transition services the District has been providing.

Finally, in order to defuse the tension that was evident between counsel during the due process hearing, the IEP team will be required to meet with the assistance of an IEP facilitator provided either through ODR or privately. It must be noted that contrary to the suggestion that the teachers and District administrators were either uncaring or actively biased against Student and Parent, which Parent's lead counsel attempted to establish by tone of voice, comments, and innuendoes throughout the hearing, there was not a shred of evidence or other indication in the patient and professional demeanor exhibited by all District witnesses during their extensive testimony that the District bears either Parent or Student any ill will or put forth less than a full and thoughtful effort to provide Student with an appropriate educational program.

Nevertheless, given the poisonous atmosphere that the clear animosity between counsel created during the hearing, it may not be possible for the parties to work together productively without the assistance of a neutral third party. An advocate for Parent may certainly be involved in any and all IEP meetings, as well as counsel, if the parties so desire. Consideration, however, should be given to whether it would be more productive for other attorneys within the firms representing the parties to be involved in the IEP process since cooperation and some degree of cordiality going forward is highly desirable if not actually necessary.

28

## CONCLUSION

An appropriate order will be issued to give effect to the foregoing decisions.

*Anne L. Carroll*

———————————————————
Anne L. Carroll, Esq.

HEARING OFFICER

March 11, 2010