IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTINE DUDLEY, PARENT AND       :        CIVIL ACTION
EDUCATIONAL DECISION MAKER FOR     :
W.J.W., et al.                     :
                                   :
            v.                     :
                                   :
LOWER MERION SCHOOL                :
DISTRICT                           :        NO. 10-2749

MEMORANDUM

Bartle, J.                                November 29, 2011

        Plaintiff Christine Dudley and her son W.J.W. bring
this action against the Lower Merion School District ("School
District") for violations of the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  Before the
court is the motion of the School District for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure.

                              I.

        Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  A dispute is genuine if the evidence is
such that a reasonable jury could return a verdict for the
non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
254 (1986).  After reviewing the evidence, the court makes all

reasonable inferences from the evidence in the light most favorable to the non-movant.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

However, this court must depart from the traditional standard of review for summary judgment when considering an appeal from a hearing officer's decision under the IDEA.  The party seeking relief bears the burden of proof and must demonstrate that he is entitled to relief by a preponderance of the evidence.  Schaeffer v. Weast, 546 U.S. 49, 62 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 392 (3d Cir. 2006).  We apply a modified version of de novo review and give due weight to the factual findings of the administrative hearing officer.  S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003).  A hearing officer's determinations regarding credibility of live testimony are entitled to special weight. Id. at 199.  We must accept the credibility determinations "'unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion.'"  Id. (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)) (emphasis omitted).

## II.

W.J.W. was born in 1991 and is now twenty years old. He was identified as a student with a specific learning disability in first grade.  He was later also diagnosed by the School District as suffering from an emotional disturbance.  This action involves the school years 2007-2008 to the present.

In April, 2007, W.J.W. was arrested and charged with robbery, assault, and criminal conspiracy.  He pleaded guilty to the robbery and conspiracy charges.  At the time, W.J.W. was on probation for other juvenile offenses.  He was committed to Glen Mills School Residential Program, a juvenile detention facility located in Concordville, Pennsylvania from July, 2007 until April 18, 2008.

After W.J.W. returned to Lower Merion School District, his individualized education plan ("IEP") team met on April 24, 2008.  The team recommended that W.J.W. be educated at an out of district placement.  His mother refused, believing that an out of district placement meant a juvenile detention facility like Glen Mills, which W.J.W. had not liked.  Instead, W.J.W. entered regular tenth grade classes at Lower Merion High School for the remainder of the school year.  His IEP stated that W.J.W. would receive emotional support services for 45 minutes a week and transition planning for 45 minutes every three weeks.

During the 2008-2009 school year, W.J.W. was enrolled primarily in regular education eleventh grade classes, two of which were co-taught by a special education teacher and a regular teacher.  He also had two instructional support labs.  W.J.W. was reevaluated in September, 2008 but refused to participate in the testing.  As a result, the reevaluation focused on a review of his records, information from his parent, and information from his teachers concerning his academic progress.  W.J.W. declined

the opportunity to work with a math specialist one on one after two sessions and missed his emotional support sessions.

The transition coordinator for the School District first became involved in providing services to W.J.W. at a September, 2008 IEP meeting.  At that time, W.J.W. expressed interest in a part-time work experience program.  His mother agreed to the change on January 29, 2009.  W.J.W. was placed in a volunteer program at Lankenau Hospital, where he served as a messenger in the afternoon.  The volunteer position allowed W.J.W. to work on employment skills such as punctuality, taking direction, asking for clarification, and advocating for workplace needs.  He performed well in the position.

In addition, W.J.W. was provided with a job coach who helped him prepare a resume and apply for other jobs.  He completed an interest inventory and a vocational assessment to determine his future career goals.  The School District transition coordinator took W.J.W. to a community college symposium for students with disabilities.  To accommodate his work program, the emotional support sessions were decreased to one 30-minute session a month and the direct reading instruction was eliminated.

W.J.W. continued to take regular education classes in the morning and work at Lankenau Hospital in the afternoons when he returned to the School District in September, 2009.  Soon thereafter, he reduced the work experience to three days per week.

In March, 2009, local police charged W.J.W. with theft. This charge was based on another student's complaint that W.J.W. removed his bicycle from school property.  Camera surveillance confirmed the allegation.  W.J.W. was placed at a juvenile detention facility outside the School District from April 3, 2009 until August, 2009.

Dudley, W.J.W.'s mother, filed a due process complaint against the School District on July 1, 2009.  She sought:  (1) an independent educational evaluation ("IEE") at public expense; (2) compensatory education for the years 2007-2008 and 2008-2009; (3) intensive reading, writing, and math instruction; (4) private emotional counseling; (5) a private placement for the 2010-2011 school year; and (6) an IEP team meeting to draft an appropriate IEP.

At the time of the hearing, the School District had two settlement offers open to plaintiffs for more than ten days.  The School District first offered plaintiffs a mutually agreed-upon out of district placement for the 2009-2010 school year, transportation to the placement, and funding for an IEE.  The School District later made an alternative offer of $37,500 in compensatory education and funding for an IEE.  Plaintiffs did not accept either offer.

On March 11, 2011, the hearing officer issued her decision.  She directed the School District to provide W.J.W. with daily intensive reading and math instruction and thirty minutes of emotional support services a week.  This amounted to

-5-

349.5 hours of compensatory education with a value of $26,212.50.
The hearing officer also ordered that the School District ensure
that W.J.W. accepted the services offered by escorting him to the
classrooms if necessary.  She denied plaintiffs' claim for an
IEE.

Nonetheless, W.J.W. attended the reading and math
instruction only sporadically.  He also refused to attend
emotional support services with Dr. Chiradonna, the high school's
emotional support counselor.  At an IEP team meeting on May 4,
2010, the team agreed that W.J.W. could attend emotional support
services with his guidance counselor Paul Petrillo, with whom he
had a good relationship.  Despite this accommodation, W.J.W.
continued to skip his emotional support sessions.  Both W.J.W.
and his mother believe that he does not need emotional
counseling.  The School District tried to convince him to attend
these sessions by talking with him, trying to escort him, calling
his mother, and speaking with his attorney.  The entire team
including W.J.W., his mother, and his counsel later agreed that
it would be counterproductive to escort W.J.W. to class.

On April 8, 2010, the School District proposed an IEP
in accordance with the hearing officer's order.  After the
meeting, W.J.W.'s mother approved a Notice of Recommended
Placement ("NOREP") which stated that a private school placement
for the 2010-2011 school year would be determined through the
School District's referral process.  At the time, W.J.W. lacked
one math credit needed to graduate.  The District proposed that

W.J.W. earn this credit by working with a teacher to complete the
Keystone Program in Math at Kaplan Tutoring Center.  His mother
rejected this proposal.

The School District convened three IEP meetings, on
April 8, May 4, and August 30, 2010.  An IEP facilitator from the
Office for Dispute Resolution attended two of the sessions, based
on the hearing officer's order.  The School District explored
several out of District placements, including:  (1) Academy at
Manayunk; (2) Green Valley Academy; (3) Hilltop Preparatory; (4)
Woodlynde School; (5) Phelps School; (6) Valley Forge Military
Academy; (7) the Anderson School; (8) Lakeside Vantage School;
(9) Devereaux Mapleton; (10) Wordsworth Academy; and (11) Lincoln
Academy.  W.J.W. was not accepted to six of the schools.  The
remaining four considered accepting W.J.W. but wanted to conduct
interviews or other assessments.  Plaintiffs rejected these
schools and did not schedule interviews.

The District then held another IEP meeting on
August 30, 2010 to discuss W.J.W.'s options for the 2010-2011
school year.  On September 1, 2010, the School District proposed
a program for W.J.W. at Lower Merion or Harrington High School.
W.J.W. declined both schools.  In the alternative, the School
District suggested that W.J.W. attend tutoring at Kaplan Tutoring
Center to earn his math credit needed to graduate and prepare for
college or military entrance tests.  Sometime in October 2010,
plaintiffs agreed to this.  The School District purchased a
public transportation pass for W.J.W., but it was never picked

up.  W.J.W. was arrested for burglary and various other charges the week he was to begin Kaplan, and therefore he never attended.

W.J.W. remained incarcerated in Montgomery County Prison until November 18, 2011.  On that date, he pleaded guilty to burglary and intentional possession of a controlled substance. He was released on bail pending sentencing.

Plaintiffs filed this action on June 8, 2010 in which they appeal certain aspects of the hearing officer's decision. They also argue that W.J.W. was denied a Free Appropriate Public Education ("FAPE") because his mother was deliberately and frequently excluded from the decision-making process, he was not provided an adequate transition program, and he was wrongfully placed into racially segregated special education classrooms. They assert that the hearing officer erred because she granted W.J.W. "at least" one more year of educational services but failed to recognize that he is entitled to educational services until the age of twenty-one under the IDEA.  He asks this court to reverse the hearing officer's decision because the officer did not make a "specific finding concerning IEPs with measurable present levels of performance, and goals and objectives ... [and] behavioral planning."  He also seeks enforcement of favorable aspects of the hearing officer's decision and reasonable attorneys' fees.  In response, the School District has filed a counterclaim asking this court to vacate the hearing officer's order to ensure that W.J.W. attends his reading, math, and emotional support sessions.

III.

We begin with the plaintiffs' challenge to aspects of
the hearing officer's decision.  Plaintiffs first argue that the
School District "seriously infringed on parental participation."
Plaintiffs maintain that the rights of W.J.W.'s mother were
infringed because:  (1) the School District repeatedly deferred
to W.J.W. instead of his mother; and (2) his mother was not
provided clear information, including the name of a private
school placement that the School District was proposing from 2008
to September 2010.

Under the IDEA, a school district "shall ensure that
the parents of each child with a disability are members of any
group that makes decisions on the educational placement of their
child."  20 U.S.C. § 1414(e).  The parent is the educational
decisionmaker in Pennsylvania until his or her child reaches the
age of twenty-one.  See 1 Pa. Cons. Stat. Ann. § 1991.  The
School District "must take whatever action is necessary to ensure
that the parent understands the proceedings of the IEP Team
meeting."  34 C.F.R. § 300.322(e).

The hearing officer properly concluded that the School
District did not infringe upon the rights of W.J.W.'s mother.
During the time in question, his mother attended all IEP team
meetings accompanied by an attorney and/or an advocate or friend.
Both she and a friend who attended the meetings testified that
they would ask questions when they did not understand something
during the meetings.  Furthermore, counsel for plaintiffs

-9-

instructed the School District that no one should speak with W.J.W.'s mother outside of her counsel's presence.  The School District had no reason to know that W.J.W.'s mother had difficulty reading or understanding the matters discussed at the meetings.

Plaintiffs submit the affidavit of W.J.W.'s guidance counselor Paul Petrillo which they claim demonstrates the School District's deference to W.J.W. instead of his mother.  In the affidavit, Petrillo recounts the events of a May 4, 2010 IEP meeting at which W.J.W.'s mother was present.  The affidavit demonstrates that Petrillo followed up with her several times and obtained her signature on release forms for W.J.W.'s college applications.  We fail to see how this affidavit supports plaintiffs' position that decisions were made without the input of W.J.W.'s mother.

The contention of W.J.W.'s mother that her parental rights were infringed by the School District's failure to identify a specific private school in the IEP is similarly unavailing.  According to the United States Department of Education, there is no requirement that an IEP identify a specific school.  T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419-20 (2d Cir. 2009); but see A.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 682 (4th Cir. 2007).

Plaintiffs next contend that the hearing officer erred when she concluded that the School District provided appropriate transition services.  Under the IDEA, students with disabilities

are entitled to a plan to facilitate their transition to post-secondary education, employment, and/or independent living.  20 U.S.C. § 1401(34)(A).  The plan should be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and ... include[] instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation."  Id. at § 1401(34)(B)-(C).  In Pennsylvania , transition services must begin at age fourteen.  22 Pa. Code § 14.131(a)(5).

Our Court of Appeals has not defined the quantity or quality of transition planning required under the IDEA.  See High v. Exeter Twp. Sch. Dist., No. 09-2202, 2010 WL 363832, at *6 (E.D. Pa. Feb. 1, 2010) (citing Sinan L. v. Sch. Dist. of Phila., No. 06-1342, 2007 WL 1933021 (E.D. Pa. July 2, 2007)).  However, it appears that a transition plan need not set forth specific goals.  K.C. v. Nazareth Area Sch. Dist., No. 10-4323, 2011 WL 3792405, at *15-16 (E.D. Pa. Aug. 26, 2011).  Furthermore, a School District need not ensure that the student is successful in fulfilling transition goals.  Id. at *16.  Rather, transition services must provide some, or more than a de minimis, benefit.  Id. (citing M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 396 (3d Cir. 1996)).

During most of the 2007-2008 school year, W.J.W. was educated at Glen Mills due to a court-ordered placement and

-11-

therefore was not available for transition planning.  No written IEP for W.J.W. included specific transition goals until January, 2009.  However, the School District began to address W.J.W.'s needs earlier, in September, 2008.  At that time, the School District held an IEP meeting focused on transition planning which included its transition coordinator.  The IEP team began discussing work experience opportunities for W.J.W.

In January, 2009, W.J.W. began a half-day work experience program as an unpaid messenger at Lankenau Hospital. The work experience program allowed W.J.W. to build basic employment skills such as punctuality, attendance, following directions, asking for clarification, and advocating for workplace needs.  The School District provided a job coach who assisted W.J.W. until he could work independently.  The job coach later helped W.J.W. prepare a resume and apply for paid employment positions.  The School District also administered tests to W.J.W. to assess his interests and brought him to a community college symposium for students with disabilities.

We agree with the hearing officer that these transition services conferred more than a de minimis benefit upon W.J.W. Plaintiffs have not come forward with any evidence specifically to rebut the determinations of the hearing officer.  Accordingly, we decline to reverse the hearing officer's decision as to this issue.

Plaintiffs next contend that the School District violated the IDEA when it destroyed testing protocols used in the

evaluation of W.J.W.  In response, the School District maintains that it destroyed the testing protocols within one year pursuant to established School District policy.

According to plaintiffs, the destruction of testing protocols denied them an opportunity to support their claim that W.J.W. was misidentified as disabled in 1991.  That claim, however, is not before this court.  See Dudley v. Lower Merion Sch. Dist., No, 10-2749, 2011 WL 5237308, at *2 (E.D. Pa. Nov. 3, 2011).

Even assuming that the School District destroyed testing protocols to which plaintiffs were entitled, this would be at most a procedural violation of the IDEA.  Plaintiffs may only seek prospective injunctive relief to remedy a procedural violation of the IDEA.  See C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010) (citing P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009)).  Plaintiffs have not come forward with any other evidence that the destruction of testing protocols caused W.J.W. to be denied a free appropriate public education for the years in question.  Accordingly, the motion of the School District for summary judgment will be granted with respect to this claim.

In their complaint, plaintiffs also challenge the hearing officer's finding that they were not entitled to reimbursement from the School District for their IEE.  Under the regulations governing the IDEA, "[a] parent has the right to an independent educational evaluation at public expense if the

-13-

parent disagrees with an evaluation obtained by the [School District]." 34 C.F.R. § 300.502(b)(1).  A School District must either "[e]nsure that an independent educational evaluation is provided at public expense" or "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate." Id. at (b)(2)(i)-(ii).

Plaintiffs assert that the School District never sought a due process hearing after refusing the parent's request for an IEE and therefore the School District should be responsible for reimbursing them.  This argument is without merit.  As part of their due process complaint, plaintiffs included a claim for reimbursement for the IEE.  There was no reason to require the School District to file a separate due process complaint when the same issue was already being litigated in front of the hearing officer.  Plaintiffs claim that the hearing officer impermissibly shifted the burden of proof to them to show that the School District's evaluation was inappropriate, but they offer no specific evidence that this occurred.

Dr. Craig Cosden, a school psychologist, conducted the School District's reevaluation of W.J.W.  Cosden administered the Wechsler Intelligence Scale for Children IV to assess W.J.W.'s cognitive ability.  W.J.W. scored in the borderline range of intelligence with a full scale IQ of 73.  He achieved a score of

77, the sixth percentile,[1] on both the verbal comprehension and perceptual reasoning aspects of the test.  W.J.W.'s strengths were in working memory and processing speed.  He achieved a score of 83, the thirteenth percentile, in working memory and a score of 80, or the ninth percentile, in processing speed.  Overall, the School District noted that W.J.W. frustrated easily and was willing to guess at answers.  Because of his frustration and resistance to the examination, the School District estimated that his IQ was likely higher, in the range of 80-89.  W.J.W.'s scores on the Wechsler Individual Achievement Test II in the areas of reading, math, and writing were well below grade level.  His performance on that achievement test was also significantly below his cognitive ability, with many scores in the lower range of the first percentile.

The independent evaluation of W.J.W. was conducted by Umar Abdullah-Johnson in November, 2009.  On the Wechsler Adult Intelligence Scale IV administered by Abdullah-Johnson, W.J.W. achieved a full scale IQ score of 82.  His verbal comprehension score was 74, his perceptual reasoning score was 100, his working memory score was 80, and his processing speed score was 86.  His scores on the Wechsler Individual Achievement Test III in math, reading, and writing ranged from the first percentile to the ninth percentile.

---

1.  The percentile is a measurement from a scale of 1 to 100, with the first percentile being the lowest and the 100th percentile being the highest.  It is based on the general population of students who are the same age as W.J.W.

The hearing officer correctly found that the results of
the evaluation conducted by the School District and that of
Abdullah-Johnson were similar.  Although they administered
slightly different versions of the Wechsler tests, both the
School District evaluator and the independent evaluator found
that W.J.W.'s IQ was in the 80-89 range and that he was
functioning significantly below grade level.  Both evaluators
concluded that W.J.W. lacked confidence and has a habit of
guessing when faced with challenging questions.  Furthermore,
both evaluators noted a history of behavioral difficulties which
may have impacted his education.  Because there is no significant
disparity between the School District's and the independent
evaluator's assessment of W.J.W.'s intellectual functioning, the
School District met its burden of demonstrating that its
evaluation was appropriate.  Although plaintiffs may disagree
with the hearing officer's decision, they have not demonstrated
that the hearing officer's conclusion, given due deference, is
erroneous as to this issue.

Plaintiffs next assert that W.J.W.'s IEP goals were
"woefully deficient."  The IDEA provides that an IEP is a
"written statement for each child" that includes the child's
present levels of achievement, measurable goals, how the child's
progress will be measured, and the services the child will
receive.  20 U.S.C. § 1414(d).  A school district must provide an
"'appropriate'" IEP for the student, not an "optimal" IEP.

-16-

Carlisle Area Sch., 62 F.3d at 529 (quoting Board of Educ. v.
Rowley, 458 U.S. 176, 200 (1982)).

            After reviewing the IEPs for the school years in
question, we find that they provide clear objectives.  Although
they state that "a baseline for this goal will be established by
the end of January 2009," they nonetheless set forth measurable
goals.  For example, the IEP for the 2008-2009 school year states
that W.J.W. "will correctly solve 85% of problems ... in 8 of 9
weekly trials" in math and will draft "a direct response of 2 or
more paragraphs ... that earns a score of 3 or better on a
teacher-created rubric" in writing.  The lack of baselines, in
and of itself, does not render the IEP inadequate.  Accordingly,
we will not overturn the hearing officer's finding that the
School District provided "detailed IEPs with annual goals
designed to meet [W.J.W.'s] needs arising from both his learning
disabilities and emotional disturbance."

            Plaintiffs next contend that the hearing officer erred
by awarding them an insufficient amount of compensatory
education.  Under the IDEA, compensatory education may be awarded
where a school district knows or has reason to know that a
student's educational program is not appropriate or that he is
receiving only a de minimis benefit and fails to correct the
situation.  M.C., 81 F.3d at 397.  The amount of compensatory
education is calculated by finding the period of deprivation of
special education services and excluding the time reasonably
required for the school district to rectify the problem.  Id.

The hearing officer correctly concluded that W.J.W. was
not entitled to any compensatory education for the 2007-2008
school year.  From the beginning of that school year until
Wednesday, April 18, 2008, W.J.W. was in a juvenile detention
facility and therefore the School District was not responsible
for his educational program.  On Tuesday, April 24, 2008, his IEP
team met to devise an IEP.  Contrary to plaintiffs' assertions,
W.J.W. is not entitled to compensatory education for the "delay"
of less than a week.  Under the Pennsylvania administrative code,
a reevaluation of a student with disabilities shall be completed
and presented to the student's parents no later than sixty days
after the school district receives written parental consent for
evaluation.  See 22 Pa. Code § 14.124(b).  An IEP must be
implemented as soon as possible but no later than ten days after
it is developed.  See id. at § 14.131(a)(6).  These provisions
demonstrate that the School District is entitled to a reasonable
period of time in which to create and implement an IEP.  The IEP
created by the School District was primarily designed to
facilitate W.J.W.'s transition back to high school and was
reasonable given the fact that the school year was more than
three-fourths complete.

The hearing officer's award of compensatory education
for the 2008-2009 school year was similarly appropriate.  The
hearing officer awarded W.J.W. direct, intensive reading
instruction for the length of an academic literacy period for
each day W.J.W. attended school from January 29, 2009 through

-18-

April 2, 2009, the last day before W.J.W. entered a court ordered
juvenile detention facility.  She also ordered the School
District to provide W.J.W. with direct, intensive math
instruction for the length of a regular class period for each day
he attended school from the first day of the school year through
April 2, 2009.  Finally, she awarded W.J.W. with emotional
support or counseling services equal to thirty minutes per week
that school was in session from November 1, 2008 through April 2,
2009.  This award properly compensated W.J.W. for the reading
instruction that the School District eliminated and the math and
emotional support services that it allowed W.J.W. to decline.

        As to the 2009-2010 school year, the hearing officer
ordered the School District to provide intensive daily
instruction in math and reading and thirty minutes of emotional
support per week from the date of her decision, March 11, 2010,
until the end of the school year.  She also directed the School
District to provide as compensatory education math and reading
instruction for a length of time equal to a daily class period
and emotional support for thirty minutes a week from the
beginning of the school year to the date that the School District
implemented her decision.  Thus, plaintiffs' contention that the
hearing officer awarded no compensatory education for the 2009-
2010 school year is contradicted by the clear language of the

officer's order.[2]  We will grant the School District's motion for
summary judgment as to this issue.

IV.

We turn next to plaintiffs' claim for attorneys' fees.
Under the IDEA, a court may "award reasonable attorneys' fees as
part of the costs to a prevailing party who is the parent of a
child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i).  Our
Court of Appeals has stated that:

> A party need not achieve all of the relief
> requested nor even ultimately win the case to
> be eligible for a fee award.  "[A]s long as a
> plaintiff achieves some of the benefit sought
> in a lawsuit, even though the plaintiff does
> not ultimately succeed in securing a
> favorable judgment, the plaintiff can be
> considered the prevailing party for purposes
> of a fee award."

J.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 271 (3d Cir.
2002) (quoting Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128,
131 (3d Cir. 1991)).  We previously determined that plaintiffs
were prevailing parties at the administrative level under this
standard.  See Dudley v. Lower Merion Sch. Dist., 768 F. Supp. 2d
779, 781-82 (E.D. Pa. 2011).

However, the IDEA also dictates that a court may not
award attorneys' fees where a school district made a written

_____

2.  Plaintiffs also maintain that the hearing officer erred
because she offered no relief for a lack of an extended school
year ("ESY") in 2008 and 2009.  Plaintiffs did not raise this
issue in their due process complaint.  They offer no explanation
of why W.J.W. was eligible for this program or how he was harmed
by the lack of ESY.  Accordingly, plaintiffs cannot rely on the
denial of ESY to challenge the award of compensatory education.

offer of settlement more than ten days before commencement of the due process hearing and "the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement."  20 U.S.C. § 1415(i)(3)(D).  Based on this section, the School District argues that plaintiffs were not prevailing parties at the administrative level because they received less relief than offered by the School District in settlement.

As previously discussed, the hearing officer granted W.J.W. compensatory education for 2007-2008 and a portion of the 2009-2010 school year.  This compensatory education totaled 349.5 hours which equates to a value of $26,212.50.  The hearing officer denied plaintiffs' request for an IEE and denied an out of district placement for the 2009-2010 school year.  She ordered that the School District provide W.J.W. with reading, math, and emotional support services for the remainder of the 2009-2010 school year.  Additionally, she noted that W.J.W. lacked insufficient credits to graduate at the conclusion of the 2010-2011 school year and thus directed the School District to provide W.J.W. with educational services for a minimum of one additional school year in 2010-2011.  She instructed that W.J.W.'s IEP team should meet to determine an appropriate placement for that school year and that W.J.W. should not be required to return to regular academic classes at Lower Merion High School unless he agreed to do so.

The School District had two settlement offers outstanding for more than ten days at the time the due process

hearing began.  The first settlement offer specified that the School District would send W.J.W. to a mutually agreed upon out of district placement for the 2009-2010 school year and conduct a multi-disciplinary reevaluation in the Fall of 2009.  It also stated that should an appropriate out of district placement not be found by the beginning of the 2009-2010 school year, the IEP team would meet to plan an appropriate program at the School District until an out of district placement was agreed upon.

The second settlement offer included 500 hours of compensatory education totaling $37,500, which could be used by plaintiffs to fund a unilateral private placement for the 2009-2010 school year and/or vocational training, job training, or other educationally related expenses and an IEE up to $2000.  In exchange, W.J.W. would have to withdraw from the School District for the 2009-2010 school year.  Plaintiffs would also have to agree that W.J.W. would accept his diploma and graduate should he become eligible for graduation by the school in which he was placed by his mother.

Plaintiffs argue that the first offer is "vague" and is "essentially nothing more than an offer to talk" because, among other things, the offer does not include an IEP.  We are not persuaded.  Both settlement offers were memorialized in detailed letters stating the specific terms of settlement.  An IEP is a lengthy document that can only be created with the input of the entire IEP team after a meeting.  Therefore, it is unreasonable

to expect the School District to propose unilaterally a specific IEP in order to settle a case.

While the School District included in its second offer an IEE and compensatory education equaling $39,500, the hearing officer ordered no IEE and only $26,212.50 in compensatory education, leaving a difference of $13,288.  The hearing officer also found that W.J.W. was not entitled to a private placement for the 2009-2010 year based on a finding that the IEPs offered by the School District were "largely appropriate."[3]

Accordingly, the offers of settlement were more favorable than the hearing officer's award, and summary judgment in favor of the School District will be entered on this claim.

V.

Finally, we turn to the plaintiffs' claim for enforcement of the hearing officer's decision.  In response, the School District has brought a counterclaim to appeal the hearing officer's order that the School District "[a]ssure that [W.J.W.] arrives at the location where each designated period of reading instruction, math instruction and emotional support services are to be delivered and remains in the room for the entire period, escorting him to the room if necessary."  The School District

---

3. Although the hearing officer mandated that the School District provide an additional year of instruction to W.J.W. because he lacked insufficient credits to graduate, both parties agree that W.J.W. was already entitled to continued educational services until he turned twenty-one or met his IEP goals under the IDEA.  See 20 U.S.C. § 1412(a)(1)(A).

requests that we vacate this portion of the hearing officer's decision.

The hearing officer ordered that the School District provide W.J.W. with intensive instruction in reading and math and emotional support services for the remainder of the 2009-2010 school year.  Within thirty days of the hearing officer's decision, the School District scheduled these services for W.J.W.  However, W.J.W. soon began to decline these services.

The School District made substantial efforts to compel W.J.W. to attend these classes, including speaking with W.J.W., trying to escort him to classes, calling his parent, and speaking to his attorney.  Plaintiffs have not denied that the School District made these efforts and have come forth with no admissible evidence to show that W.J.W. was cooperative during the time in question.  The School District cannot use physical force on W.J.W. aside from escorting him to class, which it attempted to do.  See 22 Pa. Code § 14.133.  This represents a reasonable, good faith effort to comply with the hearing officer's decision.  The School District need not be compelled to engage in an exercise in futility.  Therefore, we will grant the School District's counterclaim on this issue.

The hearing officer ordered that the School District convene W.J.W.'s IEP team to determine an appropriate placement for the 2010-2011 school year.  She also mandated that the School District provide W.J.W. with an additional year of schooling for the 2010-2011 school year.  The additional year of schooling

would be a placement other than Lower Merion High School, unless
W.J.W. agreed to return there.

The School District convened the IEP team on April 8,
2010 and May 4, 2010.  During the summer of 2010, the School
District sent letters to the following schools requesting
placement for W.J.W.:  (1) Academy at Manayunk; (2) Green Valley
Academy; (3) Hilltop Preparatory; (4) Woodlynde School; (5)
Phelps School; (6) Valley Forge Military Academy; (7) the
Anderson School; (8) Lakeside Vantage School; (9) Devereaux
Mapleton; (10) Wordsworth Academy; and (11) Lincoln Academy.  The
School District was willing to place W.J.W. at any of those
programs if he was accepted and plaintiffs agreed.  W.J.W. was
not accepted to the Academy at Manayunk, Green Valley, Hilltop,
Woodlynde, Vantage, or Valley Forge.[4]  Four of the schools
considered accepting W.J.W. but needed to conduct interviews or
other assessments.  Plaintiffs rejected these schools and did not
schedule interviews.

The District then held another IEP meeting on
August 30, 2010 to discuss W.J.W.'s options for the 2010-2011
school year.  On September 1, 2010, the School District sent a
letter to plaintiffs reiterating its willingness to send W.J.W.
to an out of district placement.  In the alternative, the School
District proposed a program for W.J.W. at Lower Merion or

---

4.  W.J.W. was particularly interested in Valley Forge Military
Academy.  However, that school had never accepted any student
referred by the School District.

Harrington High School.  As a final option, the School District proposed that W.J.W. attend tutoring at Kaplan Tutoring Center. At Kaplan, W.J.W. could work with a tutor to complete the Keystone Online Math Course to earn the math credit he needed to graduate high school.  He could also prepare for the Armed Services Vocational Aptitude Battery Test or the SAT Reasoning Test for application to college or the military.

W.J.W. declined to attend either Harrington or Lower Merion High School.  In October, 2010, plaintiffs agreed to placement for W.J.W. at Kaplan.  The School District purchased a public transportation pass for W.J.W. on November 30, 2010. Unfortunately, his mother was hospitalized and could not pick up the pass.  The School District did not mail the pass because it needed a receipt from W.J.W.'s mother.  W.J.W. was arrested for burglary charges the week he was to begin the program in December 2010 and therefore never attended the program.

Contrary to plaintiffs' contention, the School District did not fail to comply with the hearing officer's decision merely because the IEP team failed to agree on a placement for W.J.W. for the 2010-2011 school year.  The uncontroverted record evidence demonstrates that the School District proposed over a dozen different options to W.J.W. and his parent.  The School District cannot compel private schools to accept W.J.W. and cannot be found in violation of the hearing officer's decision merely because plaintiffs rejected every suggested private placement to which W.J.W. was admitted.

Moreover, plaintiffs' contention that the School District failed to comply with the hearing officer's decision by failing timely to offer a public transportation pass to Kaplan is insufficient to defeat summary judgment.  The record shows that the School District had proposed the Keystone Math Program and Kaplan in March 2010 and again in September 2011.  It is unclear when plaintiffs accepted the program, but it appears it was not until October 2011.  Nonetheless, the hearing officer included nothing in her decision about transportation and therefore any failure of the School District to provide a pass is irrelevant.

The goals of the IDEA can be fulfilled only if both school officials and parents work together.  Christen G. v. Lower Merion Sch. Dist., 919 F. Supp. 793, 814 (E.D. Pa. 1996).  The history of this case is unfortunate.  Until very recently, W.J.W. remained incarcerated in an institution located in another school district.  That school district provided an IEP for W.J.W. Plaintiffs report that W.J.W. received tutoring and counseling while incarcerated and that Lower Merion paid for this service. We hope that W.J.W. can use the hearing officer's award of compensatory education to attain his diploma and gain the reading and math skills necessary to lead a productive life.

Accordingly, the motion for summary judgment of the School District will be granted.[5]   The motion of the School District for summary judgment on its counterclaim will also be granted.

---

5.   Plaintiffs assert that there are material issues of fact as to whether W.J.W. was correctly classified as a student with a specific learning disability and emotional disturbance.   They also maintain that W.J.W. was placed into special education classes which were predominantly African American in violation of his right under the IDEA to be educated in the least restrictive environment.   These issues were not raised in the due process complaint and are not before the court.